[Civ. No. 14353. First Dist., Div. One. Jan. 30, 1951.]

GREGORY A. WEINGETZ, Plaintiff, v. GEORGE R. CHEVERTON et al., Defendants; CHARLES J. HIMES, Appellant; FRED LINDERMAN, Respondent.

Frank S. Hamburger for Appellant.

Carroll Single for Respondent.

WOOD (Fred B.), J. — Defendant Charles J. Himes appeals from the judgment rendered against him and in favor of defendant Fred Linderman in an action in interpleader brought by Gregory A. Weingetz, as escrow holder of certain funds, against these defendants and certain creditors of Linderman and others, to determine the rights of the several defendants in and to those funds. Himes also appeals from an order denying his motion for a new trial.

It appears that Linderman owned a lumber mill, which burned on June 1, 1945. He experienced some difficulty in financing the rebuilding of the mill. Debts for labor and materials piled up. To meet these, he sought to borrow $15,000 from Bay Pacific Corporation. The negotiations resulted in the sale of the mill by Linderman to Bay Pacific Corporation, the purchaser to pay Linderman $10,000 and assume and pay the mill creditors. Bay Pacific received and recorded a deed to the property but failed to perform its part of the agreement. Linderman served a notice of rescission and then entered into a contract with Himes for the sale of the mill to the latter.

By that contract Linderman agreed to sell his interest in the property to Himes and Himes agreed to pay Linderman $10,000 and assume and pay certain debts which had been incurred in relation to the reconstruction and maintenance of the mill. The dispute between these parties, at the trial and upon this appeal, is in relation to the nature of the debts thus assumed by Himes. Linderman contends they comprehended all such debts, including labor claims, materialmen's claims, taxes, insurance premiums, and unpaid balances on machinery, except labor claims and withholding taxes incurred prior to the fire of June 1, 1945. Himes contends

they comprehended labor claims only, incurred subsequent to the fire. The determination of that issue turns upon the answer to the question: Which of two certain agreements was signed by both parties and lodged with Weingetz prior to the closing of the escrow? Linderman contends it was an agreement dated January 10, 1946 (Ex. A). Himes contends it was an agreement dated January 16, 1946 (Ex. 4).

The escrow (Ex. 2), signed by Himes and Linderman, and delivered to, signed and accepted by Weingetz as escrow holder, read as follows:

"Herewith to Gregory A. Weingetz: 1. Executed deed 2. Two executed agreements 3. Signed note, $9,000.00, and 4. One check for $1,000.00 Linderman, by signature, permits delivery through Weingetz to Himes of the above deed and one original .agreement unless by 10:59 A. M., Wednesday, January 16, 1946, Himes has called off this deal. If not, Weingetz, escrow holder, will deliver deed and one copy of original agreement to Himes, and $1,000.00 check and $9,000.00 note to Linderman.

Fred Linderman

Charles J. Himes

I accept as escrow holder

Gregory Weingetz"

The trial court found that this escrow contract, executed by Linderman and Himes, was delivered by them to Weingetz as escrow holder on January 10, 1946; that the "Executed deed" mentioned in the escrow contract was a quitclaim deed of the mill property, by Linderman to Himes, notarized January .10, 1946; that the "Two executed agreements" mentioned in the escrow contract were duplicate originals of the agreement dated January 10, 1946 (Ex. A), each signed by Linderman and by Himes; that the expression "Signed note, $9,000.00," as used in the escrow contract, referred to a note which was later changed by agreement of the parties to a note dated January 16, 1946, signed by Himes as maker, whereby Himes promised to pay to Linderman, or order, $9,000, with interest at 5 per cent per annum, in amounts of not less than $500 per month, payable on or before the 10th day of each month; that by action and agreement of Himes and Linderman the closing of the escrow was postponed to January 21, 1946, during which time various counterproposals and changes in the agreements were discussed,

leading to modifications and eventually to a final agreement (Ex. 1) which was mutually satisfactory to and executed by Linderman, Himes, and Weingetz, and delivered to Weingetz as escrow holder on January 21, 1946, an agreement which changed the date for commencement of interest and of installment payments on the note, and excepted from the mill indebtedness assumed by Himes all labor claims and withholding taxes prior to the mill fire of June 1, 1945; that in and by said agreement dated January 16, 1946 (Ex. 1), the parties referred to the escrow contract and to the agreement dated January 10, 1946 (Ex. A), which was thereby ratified subject only to the changes expressed in said agreement of January 16, 1946 (Ex. 1); that thereupon, on January 21, 1946, Himes paid, through escrow holder Weingetz, to Fred Linderman the sum of $1,000 agreed to in said escrow for "One check for $1,000.00"; that there had been executed by Linderman, and delivered only to Weingetz as escrow holder, another proposed document (Ex. 4) also dated January 16, 1946, but prior in time to the aforesaid agreement of January 16, 1946 (Ex. 1), a document which had not been executed or accepted by Himes by January 21, 1946, the terms of which document were rejected and repudiated by Himes and were not a part of the final agreement of the parties.

The court's findings on the controversial issue are supported, principally, by the testimony of the witness Carroll Single, attorney for Linderman. He conducted the negotiations for Linderman, attended all the conferences, and prepared all of the documents in relation to this transaction. As to the agreement dated January 10, 1946 (Ex. A), after a fruitless demand for production of the original, respondent tendered proof by means of a carbon copy and oral testimony.

Single testified that at his office, on January 9, 1946, Weingetz, Himes, Frederick Henderson of Bay Pacific Corporation, Harry Henderson, attorney for Frederick Henderson, defendant Moore, Linderman, Porter, an associate of Linderman, and Single conferred and discussed an agreement which was later put to writing; that on the following day, January 10, there was another conference, attended by Weingetz, Himes, Moore, Single, Linderman and Freidenrich, then counsel for Himes; that at that time Single prepared the documents, which were submitted to Weingetz as escrow holder. Those documents, according to the witness, included

the quitclaim deed from Linderman to Himes, notarized on that date; the escrow agreement, calling for conclusion of escrow on the 16th of January, and the agreement dated January 10 (Ex. A) in the form of duplicate originals which were then and there handed to Weingetz and taken by him, as indicated in the escrow agreement and referred to therein as "Two executed agreements." In respect to execution of said agreement by Himes at that time, January 10, the following questions were asked of and answered by the witness Single: "Q. Do you make any claim that the agreement was signed by both parties at that time? A. I do. But I will not state too definitely. Q. Was it signed in your presence by Mr. Himes? A. I think so, but I am not positive. Q. You are not positive? A. No. Q. In fact, according to your best recollection, your answer would be no, is that correct? A. No; on the contrary, I believe that the agreements were mutually signed at that time, as shown by the escrow, two executed agreements. Q. I am not asking about any outside letters and documents, Mr. Single. The Court can take that into consideration. You don't state—or you did not see Mr. Himes sign that agreement of the 10th, did you? A. I think I did, but I am not positive."

As to Exhibit 4, which at the time of the trial bore the signatures of Himes as well as of Linderman, Single testified that he prepared the document; that in response to demand by Himes for modification of the original agreement for postponement of payment of principal and interest on the promissory note until 30 days after commencement of operation of the mill, and to confine Himes' undertaking in respect to labor claims to those which occurred after the fire at the mill, a document, signed by Linderman and lodged with Weingetz, through mistake referred to the date of the fire as of July 2 instead of June 1, 1945, which prompted a redrafting of documents; that Himes did not sign Exhibit 4 at any time in Linderman's presence or in Single's presence; Single did not know when Himes put his signature on it, but did know that Himes did not sign it on January 16 or on January 21, and that in the witness' opinion it was never signed by Himes until some date after January 21, 1946, the day when the escrow was consummated and closed.

Appellant claims that this testimony is not evidence that Exhibit A was signed by Himes or that Exhibit 4 was not signed by Himes before the closing of the escrow, because

the witness used such expressions as he thought so, he claimed, he was not positive, or he was of the opinion.

Appellant is in error in this regard. The law does not require that the result of a witness' observation be positive or absolute knowledge. Such a degree of certainty is not demanded of a witness. In an early case, a witness, shown a deed of conveyance, testified: " 'I signed my name to this paper as subscribing witness. I don't know who signed the name of Thomas or McGarrity; think Irwin wrote them; don't know whether Irwin signed it in my presence, or not; don't know that Thomas or McGarrity made their marks in my presence; but to the best of my recollection they did.' " (*McGarrity* v. *Byington*, 12 Cal. 426, 427.) The deed was admitted in evidence over the objection of the opposite party. The Supreme Court held it was properly admitted, saying: "It is true the witness says it was signed in his presence, 'to the best of his recollection'; but this is enough." (P. 430.) The applicable principle was well expressed in *People* v. *Rolfe*, 61 Cal. 540, at page 543, as follows: "The objection that the witnesses did not positively and beyond a doubt identify the defendant, can not be sustained. They expressed *the belief* that he was the person they had seen, and although their evidence was given with great caution, it was sufficiently certain respecting the identity of the defendant to go to the jury, and it was for the jury to say what weight it was entitled to." (Emphasis by the court.) In *People* v. *Soap*, 127 Cal. 408 [59 P. 771], it appeared that a witness qualified a portion of his testimony by the expression, "I presume." A motion to strike was interposed. The trial judge asked the witness: "What do you mean by saying you presume? That you are merely guessing at it, or that it was your best information?" The witness replied, "That was my best information." The judge denied the motion. Of this, the Supreme Court said: "There was no error in this; while a witness can testify only to facts which are within his knowledge, he is not required to testify with that certainty which excludes all doubt from his mind. The word 'presume' as used by the witness was nothing more than a statement of his best recollection." (127 Cal. at p. 410.) ■ An objection that evidence is not positive goes to its weight rather than to its admissibility. (*People* v. *Harlan*, 133 Cal. 16, 22 [65 P. 9].) Concerning the testimony of a witness that " '. . . I thought then I saw somebody lying on the sidewalk

*there opposite the vestibule of the saloon,'* '' the court, in *People* v. *Schoon,* 177 Cal. 678, at page 682 [171 P. 680], said: ''The witness was simply stating the result of his personal observation. In substance, he said that looking at the place indicated it appeared to him that somebody was lying on the sidewalk there. He was not positive as to this, but it then seemed to him that such was the case. There is no legal objection to such testimony. Whatever objection there may be to the same goes purely to its weight, which is a question for the jury.'' In *People* v. *Waller,* 14 Cal.2d 693 [96 P.2d 344], the witness ''Rohrscheib's identification was that while he would not say positively that the defendant was the man who attempted to rob him, that he 'looked like him,'—that he 'resembled him'; and in this connection he was asked this question: 'Calling your attention to the defendant, Waller, you think now that the man that you saw there is similar or looks like Mr. Waller, is that right?' and he answered 'yes.' The fact, however, that he was not positive does not destroy the value of the identification.'' (P. 700.)

Even if some of this testimony were vulnerable for lack of positiveness or as representing opinion instead of knowledge, it is evidence in the case, for it went in without objection, and no motion was made to strike any of it from the record. Such evidence is legally sufficient to establish a fact, and is likewise sufficient to support a finding based thereon. (*Seaford* v. *Smith,* 86 Cal.App.2d 339, 344 [194 P.2d 792] ; *Fallon* v. *Fallon,* 86 Cal.App.2d 872, 873 [195 P.2d 878] ; *People* v. *One Ford V8 Coach,* 21 Cal.App.2d 445, 448 [69 P.2d 473]. See, also, cases cited in 2 Cal.Jur. 804, § 473.)

Various circumstances support the testimony of Single and the finding based upon it. The court found, upon ample evidence, that the escrow contract was signed by Himes, Linderman and Weingetz and lodged with Weingetz on January 10, 1946. That contract recited delivery to Weingetz of an ''Executed deed'' and ''Two executed agreements.'' The deed, which is in evidence, was a quitclaim deed from Linderman to Himes,· dated and notarized on January 10, 1946. And, as of January 10, 1946, the only agreements which had been written and which could possibly answer the description ''Two executed agreements'' were the duplicate originals of the agreement dated January 10, Exhibit A. In addition, it appears without conflict in the evidence that

defendant Moore, a general mill creditor, not a labor claimant, attended the conference of January 9 to present his claim as such creditor; that Frederick Henderson at that conference admitted Moore's claim, saying that Bay Pacific Corporation would pay it; that at the conclusion of the conference on January 10 Himes left with Moore to view the mill and to attend to obtaining a deed to himself from Bay Pacific Corporation, and on that occasion Himes admitted to Moore that the documents before Himes called for payment to Moore as a general creditor of the mill. Furthermore, upon the closing of the escrow, Single, on behalf of Linderman, wrote and transmitted to Himes all papers, documents and correspondence pertaining to the mill and the mill creditors which Linderman had not theretofore delivered to Himes. These pertained to general mill creditors and were not in anywise limited to claims for labor performed at the mill. Linderman never heard further from Himes on the subject, nor did Himes deny that he received that letter and enclosures. These are corroborating circumstances tending to support the evidence and the finding that the "Two executed agreements," which the escrow contract declared were delivered to Weingetz, were duplicate originals of the agreement dated January 10, 1946 (Ex. A).

Appellant directs attention to certain portions of the testimony of respondent Linderman, referring to them as statements by a party indicative of nonexecution by Himes of Exhibit A and of execution by him of Exhibit 4 prior to the closing of the escrow. Unless those statements were tantamount to judicial admissions of a party, they amounted at most to conflicts in the evidence which the trial judge resolved against the appellant by the findings which he made.

As to execution of the agreement dated January 10, 1946 (Ex. A), Linderman's testimony, by question and answer, was as follows: "Q. Is this a typewriter carbon copy of that agreement [Ex. A]? A. Yes. Q. Was it signed on the 10th of January? A. Yes. . . . Q. By whom was it signed? A. By Mr. Himes and myself. THE COURT: Q. Did you see Mr. Himes sign it? A. Yes. I think—— Q. What? A. Yes, he signed it in our presence in Mr. Carroll Single's office. MR. SINGLE: Q. Exactly as stated on this escrow? A. Yes." Upon cross-examination, the following questions were asked of this witness, and answers given by him, in relation to Exhibit A: "Q. Now, isn't it a fact, Mr. Linderman, that

Mr. Himes never signed that agreement? A. I am not sure. Q. You are not sure? A. No. That is not the original, is it? Q. No, that is not the original. But you are not sure whether or not he ever signed it? A. I know I signed it. Q. You know you signed it? A. Yes. Q. We don't question your signing it. A. No. Q. But you are not sure that Mr. Himes signed it, are you? A. I know he agreed to sign it. Q. But he did not sign it, according to your information and knowledge, did he? A. I don't think he did. Q. You don't think he did. Mr. Linderman, isn't it a further fact that on the 10th of the month Mr. Himes definitely refused to sign any such agreement until he went up and took a look at the mill in Weott, California? Isn't that correct? THE WITNESS: What was that? THE COURT: We will have the reporter read the question. (Question read by the reporter.) A. I don't remember that. MR. HAMBURGER [attorney for appellant]: Q. You don't remember that? A. No. I remember he went and looked at the mill, but I don't remember that he refused to sign it.''

As to the execution of the disputed document dated January 16, 1946 (Ex. 4), Linderman testified, by question and answer, upon direct examination, as follows: ''Q. On the 21st of January, when Mr. Himes signed the agreement [Ex. 1], did you see him sign two on the same date, or only one? . . . A. I think he signed the two. I saw him sign two. . . . Q. What was the actual date of the fire that burned down your mill? A. On June 1, 1945. Q. Was it July 2, 1945? A. No. Q. Had a mistake been made in that document [Ex. 4] signed by you? A. It had. . . . Q. And did you correct that date in the final agreement [Ex. 1] that was signed? A. Yes. . . . Q. Did Himes sign this agreement, Plaintiff's Exhibit No. 4 . . . in your presence at any time? A. Yes, I think he signed that.'' Upon cross-examination, the witness gave the following answers to the questions stated: ''Q. Isn't it a fact that you, and Mr. Himes, and Mr. Weingetz, and Mr. Single, made and executed a new agreement on the 16th of January, 1946? A. Yes. Q. And isn't it a fact, Mr. Linderman, that this is the agreement that was finally presented by you to Mr. Himes for his approval, Plaintiff's Exhibit No. 4 (handing document to the witness)? A. You say that was the— that was signed on that date, yes. Q. That was signed on that date, but isn't that the agreement that was presented to Mr. Himes for his signature on the 16th following his

return from Weott? A. It apparently was." (Other evidence is to the effect that Linderman did not attend the conference held January 16.) "Q. Now, showing you those two agreements . . . —Plaintiff's Exhibits 1 and 4—I will ask you if those two agreements . . . were not signed by you and by Mr. Himes at one and the same time (handing documents to the witness)? A. I am not sure when Mr. Himes signed his; I know I signed it on the 16th. Q. When did you sign this one, Plaintiff's Exhibit No. 1? A. On the 16th. Q. In other words, you signed both of these on the same day? A. I did. Q. And when you signed both of these you realized one was to amend the other, did you not? A. As to the terms here. Q. In other words, the terms of Plaintiff's Exhibit No. 1, this letter written on the stationery of Single and Harrington, signed by you, were to amend this agreement also dated the 16th and also signed by Fred Linderman and by Charles Himes, that is correct, isn't it? A. Yes. Q. And furthermore, these two agreements were the agreements, were they not, that were delivered to Mr. Weingetz as the escrow agreement was put into effect, isn't that correct? A. Yes, I guess those were the two. I think they were. I am not sure." Here, again, we have the element of uncertainty in the mind of a witness concerning what he observed and what he remembered of what he had observed. Upon the production of Exhibit 4 by the escrow holder, at the trial, it did bear Himes' signature. The issue was whether Himes signed before or after the closing of the escrow on January 21, 1946. As we read the testimony of this witness, he exhibited considerable uncertainty on that question. Of significance in this connection are the following questions asked upon the cross-examination of Linderman's attorney, Single, and the testimony given by him in response thereto: "Q. Well, isn't it a fact that after you, and Mr. Himes, and Mr. Weingetz, and Mr. Linderman, and perhaps, for all my knowledge goes, several other people, did have these conferences on the 16th of January in the absence of Mr. Freidenrich? A. I am absolutely positive that Linderman did not go to Weingetz's office on the 16th of January, or at any time in that month, excepting on the 21st. Q. You did not answer my question. A. Pardon me? Q. The conference could have taken place in your office. In fact, in order to assist, and to refresh your memory on the matter, I call your attention to the fact that Mr. Linderman, your client, admitted that these conferences took place on the 16th of the month in your office. Does

that refresh your memory any? A. It refreshes my memory, but Mr. Linderman was very mistaken in those and many other matters. Q. And you insist on saying that these conferences did not take place on the 16th, in spite of the fact that all of the documents are signed on the 16th, is that correct? A. I am positive, absolutely.'' This testimony, elicited by appellant, was evidence in the case, evidence tending to show that the witness Linderman was not accurate in what he observed or in what he remembered, or both.

 It was the function of the trial judge, who observed and heard the witnesses, to determine, in reference to Linderman's testimony, whether it was simply the case of a witness who observed with lack of precision and had an indistinct recollection, or the case of a party making a judicial admission. The findings which the trial judge made demonstrate that he viewed it as merely a case of inconsistencies and uncertainties in the testimony of a witness, reflecting faulty observation or memory or both, coupled perhaps with confusion and perplexity while on the witness stand; statements of a nature, and uttered under circumstances, which the trial judge impliedly found did not amount to judicial admissions. We do not consider it the function of an appellate court to undertake to overrule that finding, even were we disposed to differ with the trial judge. The typewritten record does not disclose to us all the varied factors which he had before him, and considered and weighed, when he made that finding.

The law is clear on this point. Testimony given on the witness stand does not partake of the nature of a formal judicial admission, certainly should not be so treated in all cases, as a matter of law. The reason is well expressed by Wigmore in these words: ''Testimony in court is an elusive matter of mental operations. It is the culmination of much talk and reflection and memory-stirring between all concerned. It is full of surprises at the trial. The truth of the case depends upon a comparison of what all the witnesses say and all the circumstances indicate. A rule which binds a party to a particular statement uttered on the stand becomes an artificial rule. It is out of place in dealing with testimony. Let the judge test each case by itself.'' (IX Wigmore on Evidence, 3d ed., p. 601, § 2594a.) In *Frost* v. *Los Angeles Railway Co.*, 165 Cal. 365 [132 P. 442], our Supreme Court recognized this basic difference between statements occurring in the testimony of a party as a witness and formal judicial admissions made by him or on his behalf

during the course of a judicial proceeding. In the trial of the case then before the court, the jury had been instructed that all statements made by a party as a witness which were against his interest, the jury must conclusively presume to be true. "This," said the Supreme Court, "was clearly wrong. A party who testifies in his own behalf does not do so at the peril of having every slip of his tongue taken as conclusively true, if his inadvertently used words causes him to appear to have made a statement which is not true, but is against his own interest in the case. It is the province of the jury to observe the witness, note his manner of speech, and consider his testimony as a whole in connection with the other evidence, and it is for it to determine therefrom whether he stated the facts as he intended and understood them to be, or whether he unintentionally used words not expressing his real meaning in any particular utterances he may have made." (165 Cal. at p. 371.) (See, also, *Richey* v. *Pedersen,* 100 Cal. App.2d 512 [224 P.2d 100].) It is clear that in the instant case neither the trial judge's rejection of the questioned testimony of the respondent nor his implied finding that such testimony was not tantamount to a judicial admission can be disturbed.

Appellant urges also that even if the agreement dated January 10, 1946 (Ex. A), was signed by Himes as well as Linderman, it was modified by the later agreement of January 16, 1946, identified as Exhibit 4. The answer to that is our conclusion that the trial court's finding that Exhibit 4 was not signed by Himes prior to the closing of the escrow is supported by the evidence and cannot be disturbed.

Finally, appellant presents a jurisdictional question as a basis for reversing the judgment. He asserts that the sole issue presented by the complaint in interpleader herein was the question, "Who was entitled to the personal property that was the subject of the escrow and deposited in court?" That property so deposited consisted of the $9,000 promissory note and the sum of $9,241.14, which Himes had paid on the note to plaintiff Weingetz as escrow holder. The court did go further than that and did determine the rights and liabilities of the parties arising out of the sale of the mill from Linderman to Himes, and the respective obligations of Linderman and Himes toward the mill creditors.

It is true that the plaintiff in an action of interpleader brings such an action when he holds property to which various

persons are asserting conflicting claims and in which he has no interest other than that of stakeholder. If the plaintiff makes a proper showing and delivers the property to such person as the court may direct, the court may discharge the plaintiff from liability to all or any of the conflicting claimants, and the action may proceed for the determination of the rights of the various claimants to the property which is then in the custody of the court. · (Code Civ. Proc., § 386.) In the instant case that procedure was followed. In addition, it appeared that appellant in his answer (apparently asserting no claim to the fund itself) pleaded his version of the contract of sale from Linderman to him and alleged that as a result of the controversies between Himes and Linderman the escrow holder had been unable to distribute the moneys that had come into his possession, that various creditors had attached those moneys and placed clouds on the title to the mill purchased by Himes which endangered his right to and even his possession of the mill. He then prayed, among other things, that the court determine that Himes had faithfully performed the terms and conditions of the agreement of sale; that it determine what bills and obligations must be paid by Linderman and by Himes, respectively, by the terms of that agreement; and that it determine whether the claims of other defendants for part of the purchase price, as held in escrow, are valid, "in order that the rights of the respective litigants may be determined at one time in order that title to the mill may be cleared and further litigation of the same issues may be avoided." Respondent Linderman's answer similarly embraced issues beyond those presented by the complaint.

During the course of the trial, the court asked whether or not the issue of Linderman's purported rescission of the agreement between him and Himes (which he had pleaded in his answer but later withdrew as an issue) could be tried in this action, and counsel for appellant said: "Yes. We have asked for a complete adjudication of all the parties. If we cannot decide that in this action, then we will have to leave the money in escrow until another action is filed, and try it." The court then said: "Well, there is no question I am entitled to settle all the issues," and from that point on the trial was conducted by all participants upon the basis that all of those issues were to be settled in this action. Under such circumstances, the law does not allow a party later, as upon an appeal, to say there were no such issues or that

the findings thereon are not within the issues. (See decisions cited in 2 Cal.Jur. 239, § 69.)

The judgment appealed from is affirmed. The appeal from the order denying a new trial, a nonappealable order, is dismissed.

Peters, P. J., and Bray, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 29, 1951.