[Civ. No. 14862. First Dist., Div. Two. Aug. 25, 1952.]

SAUSALITO SHIPBUILDING COMPANY (a Corporation), Respondent, v. ALPHONSE C. LaROCCA et al., Appellants.

Joseph L. Alioto and Robert J. Drewes for Appellants.

Sefton & Anderson for Respondent.

GOODELL, J.—Plaintiff sued for a balance of $12,108.70, claimed to be owing for work done and labor and materials supplied in the repairing and overhauling of two fishing boats owned by defendants. Judgment on the findings was entered for $8,793.97, interest and costs, from which defendants appeal.

The work extended over a period of about a year and involved eight distinct jobs on the "Mary LaRocca" and the "Leonette." It is not necessary to summarize the numerous items; it suffices to say that no claim is made that the work was improperly done or that the materials were of inferior quality or defective. Defendant Alphonse La-Rocca, under a section 2055 [Code Civ. Proc.] examination by plaintiff when asked ". . . did you have complaint to make as to the work done—forget about the price—the work, itself, on these various jobs?" frankly answered "The work was all right." This simplifies the case to some extent.

Appellants say in their brief: "It would be difficult indeed to conceive of a situation wherein the contentions of the disputants were as difficult to reconcile as is presented here." We might add that if reconciliation was difficult at the trial, where the litigants were before the court as witnesses and there was every opportunity to interrogate them exhaustively with the job sheets and bills lying on top of the table, the difficulties are by no means lessened on appeal where the matter is presented on a cold record of 115 pages of typewritten transcript and 37 exhibits. This is but another way of saying that this is a fact case if ever there was one.

The principal controversy at the trial was with respect to a compromise reached on December 6, 1946. The defendants pleaded that in December, 1947 (meaning 1946) plaintiff demanded the sum prayed for in the complaint which defendants refused to pay because a disagreement existed as to the amount owing. They then alleged that the parties entered into a compromise whereby defendants promised to pay, and plaintiff promised to accept, $2,500 in full satisfaction of plaintiff's claim, and that defendants thereupon paid plaintiff $1,250 "and would have paid the balance forthwith had not the plaintiff breached the compromise agreement, and thereby the claim alleged in the complaint was satisfied; that the defendant is ready and will[ing] to pay to the plaintiff" the $1,250 remaining due under the compromise.

On December 6, 1946, a luncheon meeting was held at the LaRocca home attended by defendants Alphonse and Pasquale LaRocca and their mother, and Robert Rich, who represented the plaintiff. After lunch they got down to business and discussed the unpaid bills, as a result of which both sides agreed on a compromise figure of $2,500. The dispute was as to just what that amount was intended to settle. Then and there Alphonse LaRocca delivered to Rich a check for $1,250 and agreed to pay the remaining $1,250 after the first of the year. The remaining $1,250 was never paid, and it is included within the $8,793.97 judgment. At the time of the meeting four bills were in the hands of the defendants, to wit:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| One | dated | March 31, | 1946, | for | job | 204 | $2,340.27, |
| ,, | ,, | April 30, | ,, | ,, | ,, | 197 | 3,474.46, |
| ,, | ,, | ,, | ,, | ,, | ,, | 197-A | 5,668.85, and |
| ,, | ,, | ,, | ,, | ,, | ,, | 197-S | 282.23 |

making a total of $11,765.81 on which nothing had been paid.

On December 6 work was still under way on the "Leonette" for which no bills had been rendered or payments made on account, and on January 31, 1947, almost two months after the compromise, four bills were rendered (i.e. $38.28, $44.89, $511.37 and $1,558.35) aggregating $2,152.89. ■ It was and is appellants' contention that the $2,500 was to settle all the bills then outstanding, which, as we have seen, came to $11,765.81. On the other hand it was and is respondent's contention that the compromise was intended to settle only the bills for jobs 197 and 204 which totalled $5,814.73. The court adopted the latter view and so found. This amounted to a saving to appellants of exactly $3,314.73. Whether the parties intended the $2,500 settlement to wipe out almost $12,000 of labor and material bills, or only a part thereof, was, of course, a question of fact for the trial court. If, as appellants contend, the $2,500 was to settle all the bills, it is difficult to understand why the remaining $1,250 was not paid. The judge interrogated Alphonse LaRocca closely and incisively on this point and his questions indicate that he was not convinced by the answers he received.

Defendants' answer pleaded that plaintiff had "breached the compromise agrement." Despite the fact that the court found inferentially that plaintiff had not breached it, and

the fact that admittedly defendants had not lived up to it, the court held both sides to it, which reduced plaintiff's recovery by the substantial sum of $3,314.73.

In deciding the case the court held that the $1,250 was still owing and that all the bills sued on, except those for $2,-340.27 and $3,474.46 should be paid, and thus the $8,793.97 judgment was arrived at. The court held also that the $1,250 should bear interest from January 1, 1947, when it was due.

Appellants contend that the evidence does not support the judgment for want of expert testimony.

The basis for this attack is that there was no competent evidence to establish the reasonable value of the labor and materials. This subject cannot be properly discussed without a consideration of the theory on which the case was tried. Appellants' counsel in his opening statement said: "We contend for the defendant there was an express oral contract on the basis of which the work was initially undertaken." That was the theory of the defense. He then added: "Apparently the work was a great deal more extensive than the plaintiffs had anticipated, and as a result of that, a discussion took place on the basis of which a compromise was entered into." At the conclusion of plaintiff's case defense counsel moved "that plaintiff's exhibits one through eight be stricken from the record as immaterial and irrelevant. The evidence shows a contract, an oral contract, between the parties. That contract is the measure of damages and *actual costs that might have been incurred by the plaintiff are immaterial and irrelevant.*" (Emphasis added.) The motion was denied.

The remarks of the court at the end of the trial demonstrate that the case was tried by the defense on the theory (a) that there were express oral contracts, and (b) that the $2,500 compromise disposed of *all* the outstanding bills approximating $12,000 for labor and material. In rejecting both theories the court said:

"Well, I don't think there is hardly any question but what the preponderance of the evidence shows that there was no express oral contract. I recollect [the] way business affairs were in 1946 and 1947. Labor was scare, material was scarce, and I know that no building contractor engaged in building houses . . . or contractor engaged in building roads or highways, would give a bid unless there were the strictest specifications. Nearly all work was done

under cost plus, and even in the case of building houses, I never heard, in those days, of a contract being made that was not made on a cost plus basis. Shipyards went on a cost plus basis. Everything was done around that time in that way. There was no way of telling how labor conditions would be or what material costs would be or whether materials could be furnished or not.

"We have such a departure from that custom that was in vogue at that time, said to be an oral contract, that I will do such work for $1100, or installing a winch for $500, and it is stated here uncontradicted by a man who I think, knows what he is talking of, a winch of that type would cost four or five thousand dollars new. I don't know whether that is an extravagant estimate or not. It would seem to me a winch, the installing of a winch of the type necessary on a drag boat, would be far in excess of $500 and no man that knew what he was talking about would ever expect to be able to install a winch there, buy it and install it, for $500—I think that is out of the question. As to this memorial [memorable?] meeting in December at Mr. LaRocca's home: the testimony by Mr. LaRocca, especially by the last one on the stand, was 90% of his conclusion. He said all obligations due were included in the compromise. Of course, it is manifest he didn't know at the time just how many obligations were due or how much they amounted to. He isn't a mechanic and his ideas what repairs are or what installation costs would be, would be mostly disregarded. So far as the compromise is concerned, even though it was not entirely lived up to, yet, I am inclined to allow the compromise to stand. There wouldn't be much damage coming to the Sausalito Shipbuilding Company by not having it met, according to its terms, even if it were to be the first of January, which Mr. Al LaRocca testified to, in his first day's testimony, as I recall. In fact, I wrote a note on it. The first $1250 was to be paid then and the next was to be paid right after the first of the year. It never has been paid, but, nevertheless, the most that could be said, would be, perhaps interest would be due on it.

"So, taking that into consideration, this $5,700 job owing, and these two jobs aggregating about that amount, I am willing to let that stand, and I think all the rest of the bills should be paid."

The meeting of December 6 was for the purpose of dis-

cussing four bills which had been rendered to defendants seven or eight months before, aggregating $11,765.81 *upon which no payments whatever had been made* and as to the size of which defendants were complaining. At that meeting a compromise was reached whereby $3,314.73 was lopped off that sum (two bills aggregating $5,814.73 were settled for $2,500). In other words, the amount in dispute, which defendants claimed was too high, was voluntarily reduced by over 28 per cent, a very considerable reduction. The record is susceptible of the interpretation that the trial court viewed this compromise, whereby defendants had accomplished a reduction of their obligation by this substantial sum, as a tacit agreement that the remaining bills which had been under fire would be ultimately paid in the amounts rendered without further challenge of their reasonableness. Such an inference would be a reasonable one and wholly consonant with the very concept of compromise. It would make it mutual and bilateral instead of one-sided, a compromise in the true sense.

This much is clear in any event: that when appellants make the point that respondent did not produce competent expert evidence as to the reasonable value of the labor and materials the figure involved is not the $12,108.70 prayed for but that figure *reduced by the $3,314.73 thrown off by the compromise.*

Respondent, after all, in proving its debits against appellants, did not pursue the orthodox methods of proof. The job sheets were introduced in evidence under the testimony of Ernest Collins, who was then general manager of respondent corporation and had formerly been its assistant general manager. These sheets contained the details of time consumed on the several jobs and materials furnished. Collins testified as follows:

"Mr. Sefton: Q. In connection with all these jobs you have had a labor charge of $2.85 an hour. Was that your usual rate, your regular rate you charged on repair jobs in 1946 and 1947? A. Yes.

"Q. You charged the same rate to Mr. LaRocca on other jobs, too? A. Yes.

"Q. *And he paid those other bills, is that correct?* A. *Yes.* [Emphasis added.]

"Q. You also added on the labor 5% compensation insurance? A. Yes.

"Q. That was the usual and standard charge? A. Yes.

"Q. In connection with the material prices you charged Mr. LaRocca, how were those figures arrived at? A. Our material charges are arrived at—our cost plus 25%.

"Q. Is that lower than the regular retail price Mr. La-Rocca would have to pay on the outside? A. I don't know, but in my estimation, I believe it is.

"Mr. Drewes: I object to that on the ground it is incompetent, irrelevant, and immaterial. . . .

"The Court: I think I will allow the record to stand as it is.

"Mr. Sefton: Q. The prices you pay for materials is the wholesale price, is that correct? A. Yes."

His testimony that $2.85 an hour was the usual and regular rate charged by respondent in 1946 and 1947 and that that rate had been charged to appellants on other jobs for which they had paid the bills was, in our opinion, tantamount to testimony that it was the reasonable value of the labor involved. His testimony that the materials supplied were billed at their wholesale cost plus a write-up of 25 per cent gave a frank explanation of those items and, we think, a reasonable one. Appellants, as we have said before, tried this case on the theory that express oral contracts had been made for fixed prices, and not on the theory that a 25 per cent write-up was excessive. The court found against them on that theory, and it is to be implied from the conclusion reached by the court that the charges were considered reasonable and fair by the court—after, we repeat with emphasis, the *allowance of the substantial sum of $3,314.73.*

The case of *Nylund* v. *Madsen,* 94 Cal.App. 441 [271 P. 374], on which appellants place most reliance does not lay down a hard-and-fast rule on this subject. At page 445 the court says:

"In actions based on *quantum meruit* for the value of services, the value of the services rendered is for the jury. In this case, for the trial court, and while opinion evidence is admissible, where the facts constituting the service and all the circumstances relating thereto are placed before the trial court, the court or the jury, as the case may be, has before it sufficient upon which to determine the fact of value." And at page 447 it says: "While it is now held in practically all jurisdictions that ·opinion evidence is admissible as to value, where the witness has knowledge of the same, it is likewise held in practically all of the jurisdictions that such opinion evidence may be disregarded."

In the instant case the court had before it sufficient facts and circumstances relating to the labor furnished and materials supplied upon which to form a judgment. Moreover, the record shows that the experienced judge who tried the case was characteristically painstaking and fair to both sides.

■ Appellants contend that "The judicial admission of the plaintiff's witness Rich limits its maximum recovery to the sum of $2387.16."

On May 1, 1947, plaintiff wrote to appellants a letter reading as follows: "Gentlemen: For the purposes of a regular examination of our accounts at March 31, 1947, please confirm the balance due by you at that date of $2,387.16. Your reply should be sent directly to Harold A. Kuhn, C.P.A., Russ Building, San Francisco 4, California. A stamped addressed envelope is enclosed. Sincerely yours, Sausalito Shipbuilding Company, R. E. Rich, General Manager."

The last job was completed about January 5, 1947, hence almost four months had elapsed before this letter was written. From this it is arguable that by that time plaintiff and its accountants should have known exactly what was owing. However, the language of the letter shows that it was an accountant's routine check-up letter, although signed by the company's general manager. Rich testified that it was sent out with a "bunch" of other letters to their customers. Incidentally, the letter was never answered by appellants.

Although this claimed admission was not pleaded, it was nevertheless one of the facts in the case and the court had to decide whether the letter, either by itself or when taken in connection with Rich's testimony, had the finality of a "judicial admission." In deciding that question the court had before it the following facts: four bills had been rendered as of January 31, 1947, almost two months after the $2,500 compromise ($38.28, $44.89, $511.37 and $1,558.35) aggregating $2,152.89. The remaining $1,250 on the compromise had not been paid. The bills of April 30, 1946, for $5,668.85 and $282.23 had not been paid. The $30 cash advanced by plaintiff had not been paid. These items add up to $9,383.97, and appellants were entitled to a credit of $590 (not in controversy). The net amount unpaid, according to the evidence before the court was $8,793.97. The contention that $2,387.16 was intended to settle an $8,793.97

obligation is almost as extreme a position as the contention heretofore discussed that the $2,500 compromise was intended to settle the $11,765.81 of debits. The trial court simply did not see it that way and apparently concluded that a mistake had been made by the accountants and by Rich, however inexplicable it may have been.

One of the factors which must have influenced the court in deciding this case as it did was that for a year, all through 1946, plaintiff's employees had put in their time on the repairing and overhauling of appellants' boats and plaintiff had also laid out its own money in the purchase of the materials and equipment which went into them without the payment by appellants of anything whatever save the $1,250 on account of the $2,500 compromise. It may fairly be said that if either of appellants' contentions just mentioned were to be sustained plaintiff would be in the position of not only working for appellants for nothing, but would be making an outright gift to appellants of the materials and equipment for which plaintiff had laid out its own money.

In the case of *Weingetz* v. *Cheverton,* 102 Cal.App.2d 67, 78 [226 P.2d 742], cited by appellants in connection with Rich's testimony respecting the letter of May 1, 1947, the court quoted the following from IX Wigmore on Evidence, 3d edition, page 601, section 2594a: ''Testimony in court is an elusive matter of mental operations. It is the culmination of much talk and reflection and memory-stirring between all concerned. It is full of surprises at the trial. The truth of the case depends upon a comparison of what all the witnesses say and all the circumstances indicate. A rule which binds a party to a particular statement uttered on the stand becomes an artificial rule. It is out of place in dealing with testimony. Let the judge test each case by itself.''

On May 8, 1946, a check for $1,000 was given by appellants to plaintiff which was not applied by plaintiff against the work now in litigation but was apparently credited to other work which was being done for appellants. The application of this payment was another one of the factual questions which the trial court had to settle, and it was decided against the appellants' present contention.

Finally appellants argue that the testimony of Robert Rich ''is inherently improbable and demonstrably false.'' We repeat the quotation from appellants' brief that ''It would

be difficult indeed to conceive of a situation wherein the contentions of the disputants were as difficult to reconcile as is presented here.'' Enough has been said herein, we think, to demonstrate that this is an understatement. ▪ The task of such reconciliation, however difficult, was for the trial judge and with such conflicts as this record presents it would be just as wrong for this court to brand Rich's testimony as either improbable or false as it would be to so brand the testimony of the defendants.

The judgment is affirmed.

Nourse, P. J., and Jones, J. pro tem., concurred.