572 P.2d 1195

Berth C. NESS, Louise P. Ness, Ness Investment Company, Ness Finance Company, Wild Rice Motor Company and Grafton Implement Company, Appellants,

v.

GREATER ARIZONA REALTY, INC., an Arizona Corporation, Appellee.

Charles C. GRUTZMACHER and Desert Realty, Inc., Appellants,

v.

GREATER ARIZONA REALTY, INC., an Arizona Corporation, Appellee.

No. 2 CA–CIV 2419.

Court of Appeals of Arizona, Division 2.

Oct. 7, 1977.

Rehearing Denied Nov. 10, 1977.

Review Denied Dec. 13, 1977.

Johansson & Jordan, Ltd. by Filipe K. Johansson and Gregory R. Jordan, Phoenix, for appellants.

Stompoly & Even, P.C. by William C. Scott, Tucson, for appellee.

## OPINION

HOWARD, Chief Judge.

This appeal involves several related disputes among the two brokers and one of the principals in a real estate transaction.

Appellee Greater Arizona Realty brought suit on a promissory note from appellant Berth C. Ness which represented part of its brokerage commission on a real estate exchange between Ness and David Hvidsten. Ness counterclaimed for damages of $55,000 which he alleged resulted from the negligence of appellee's designated broker, Glenn Mangels, in computing the "boot" in the exchange. Later, these facts were set forth in amended pleadings as an affirmative defense and the counterclaim dismissed. In response to the Ness counterclaim, appellee filed a third party complaint against appellants Desert Realty, Inc. and its designated broker, Charles Grutzmacher, claiming that they were equally liable for any set-off which might be obtained against the promissory note. Grutzmacher, in his answer, denied the allegations and then counterclaimed against appellee and Glenn Mangels alleging that, under a joint venture agreement signed by Mangels, appellee was indebted to him for one half of a broker's commission it received for reselling certain property involved in the original

exchange. The counterclaim asked for an accounting of profits or in the alternative for damages for breach of the agreement to split the commission.

After a trial to the court, judgment was entered in favor of appellee on the promissory note, thereby rendering moot its third party claim against Grutzmacher and Desert Realty. The court also entered judgment in favor of appellee and Glenn Mangels on the Grutzmacher/Desert Realty counterclaim for an accounting on damages pursuant to the joint venture. Both judgments have been appealed.

### THE NESS APPEAL [1]

The following facts are relevant to the Ness appeal. David Hvidsten (who was not a party to this suit) owned certain properties in North Dakota which he wanted to exchange for property in Arizona. His agent, Glenn Mangels, contacted Charles Grutzmacher and they discussed setting up an exchange with Berth C. Ness with whom Grutzmacher had an oral listing on some property in Apache Junction. Later, Mangels and Grutzmacher agreed to pool and divide any commissions they might receive from the exchange.

In January 1969, after considerable negotiation, Ness and Hvidsten signed a contract agreeing to exchange the Ness properties for the Hvidsten properties plus "boot" in the amount of $481,900. The boot was based upon the estimated value of the properties as of January 15, 1969 (hereafter referred to as "Projected Valuations"), and was to be adjusted when the actual valuation and inventory were completed.

After Ness made a preliminary inspection of the North Dakota property, he called a meeting with Mangels, Grutzmacher, David Hvidsten and Hvidsten's father to determine why a certain 10–acre panel was not listed among the properties to be exchanged. A disagreement ensued which appeared to jeopardize the entire exchange but which was resolved when Hvidsten agreed to sell the 10–acre parcel for $55,000. Further disagreement then arose as to the best way to reflect these changes on the exchange agreement. Eventually they agreed that the 10 acres should be added to the list of properties on the exchange agreement and the boot figure reduced by $55,000. They decided it was not necessary to add the parcel to the properties listed on the "Projected Valuations".

Ness and Hvidsten then went to North Dakota to make a final inventory and appraisal. These figures were compiled on a sheet labeled "Actual Figures as of February 18, 1969" (hereafter "Actual Valuations") which included the 10–acre parcel valued at $55,000. In order to obtain the adjustment in boot, the actual valuation of $735,865.11 was subtracted from the projected valuation of $768,100 and the difference of $32,234.89 was added to the boot Ness was to receive. However, because the 10–acre parcel was included in the actual valuation but not the projected valuation, the difference should have been $87,234.89. Ness was in effect paying twice for the 10 acres—once when the boot was reduced on the exchange agreement and again when the parcel was added to the actual valuation figures.

As payment of his share of the commission, Ness gave a note to Glenn Mangels for $25,000. Ness made one payment of $5,000 but refused to pay any more on the note when he discovered the error in the boot and when Hvidsten refused to correct it. In May 1971, after Hvidsten defaulted on a $150,000 note to Ness which was part of the exchange, Ness sued Hvidsten on the note and for reformation of the exchange agreement. Hvidsten also sued appellee and Glenn Mangels for negligence in computing the boot. In August 1971, Ness and Hvidsten entered into a mutual release and settlement. The remaining count against appellee and Mangels was dismissed without prejudice in August 1972 for lack of prosecution. In January 1973, appellee brought

1. "Ness" here refers to appellants Berth C. Ness, Louise P. Ness, and the Ness entities— Ness Investment Co., Ness Finance Co., Wild

Rice Motor Co. and Grafton Implement Co., who stipulated that if any of them are liable on the promissory note, then all are.

the present suit on the note which represented its broker's commission.

■ Appellants Ness assert that they are entitled to set off their alleged damages of $55,000 against appellee's judgment on the note. Appellee contends that any set-off is barred by the statute of limitations. A party is not entitled to a set-off or counterclaim unless he is entitled to relief in a direct action. Thus, a claim which would be barred originally by the statute of limitations, is also barred as a set-off or counterclaim unless if falls within the principles of recoupment. *W. J. Kroeger Co. v. Travelers Indemnity Co.,* 112 Ariz. 285, 541 P.2d 385 (1975). As the court explained in *Kroeger,* recoupment is an equitable doctrine which can be used to reduce or eliminate a judgment, but not for affirmative relief. It is a species of defense which survives as long as the plaintiff's claim can be asserted. Wright and Miller, Federal Practice and Procedure, § 1419. Here, although a counterclaim would be time-barred, the appellants have pleaded facts as an affirmative defense which if proven could be used to eliminate appellee's judgment under a theory of recoupment.

■ The question thus remains whether appellants have proven negligence, i. e. a duty, breach of duty and injury resulting from the breach. *Vivian Arnold Realty Co. v. McCormick,* 19 Ariz.App. 289, 506 P.2d 1074 (1973). We note initially that it is not at all clear that Mangels who was the agent of Hvidsten owed any duty to Ness or that his duty extended to the preparation of the figures which caused the error. See, *Vivian Arnold Realty Co.* However, even assuming that a duty was owed to Ness, substantial evidence existed from which the court could have found that Mangels was not negligent or that if he were, Ness was contributorily negligent. As to contributory negligence, see, *Harris v. Bingham,* 246 N.C. 77, 97 S.E.2d 453 (1957).

Although the evidence is in conflict, we must view the facts in the light most favorable to sustaining the judgment. There was testimony that Ness, Hvidsten and Hvidsten's accountant were the people responsible for preparing the actual valuations which inadvertently included the 10–acre parcel. The evidence also shows that Ness was an experienced businessman, that he had participated in other real estate transactions and that he was the one who eventually discovered the error when he undertook to balance the transaction on his books. Mangels testified as to the circumstances under which the boot adjustment was made:

"A. Mr. Hvidsten brought me a copy, or gave me a copy [of the actual valuations] I believe on our way to Apache Junction. They called for a meeting. Time was of the essence. Mr. Ness had to have a payment in to the State Land Department on the 28th or he was closed out on the CP's. That was the third year of delinquency. There was no grace period, so we were working on a very tight schedule.

\* \* \* \* \* \*

Mr. Grutzmacher, myself, Mr. Ness and Mr. Hvidsten were in the conference room. This sheet come up. We were ready to get on with the deal, and I said, 'You have a copy of this, Mr. Ness?' Or are you familiar? Oh, yes. He said he was there when the accountant prepared it, we have been over it. And I said, you know, gone over it to your satisfaction? He skipped over it fastly and said yeah, it's the same one. . . . And I said well, fine, you know, if you're satisfied with it, if you have been over with it, what happened. And he said, 'Well, it's correct, it's all right. We have been over it and that's it.' He said all we got to do is subtract this figure from the one over here and adjust the boot accordingly."

Thus, the trial court may well have found that any error was caused by Ness' own negligence.

Appellants contend, however, that certain statements made by Mangels during his testimony constitute admissions of liability which are conclusive on the issue of negligence. We do not agree. At the trial below, testimony was taken separately on

each claim for relief. The statements to which appellants point were made when the court was hearing testimony on appellee's third party complaint against Grutzmacher and Desert Realty. Mangels testified:

". . . Charlie was involved as much in the transaction in figures and putting the transaction together as I was. And it's a joint situation in which he was supposed to handle his end of the transaction, and I was supposed to handle my end of the transaction. *If there was an error made it's as much his error as it is my error, or more.*

Q. There is no question that there was an error made now?

A. All right.

Q. Is that true, now? I want to make sure. If we have a problem let's start all over now. There was in fact an error, was there not?

A. *I would concede that in my opinion there was an error.*" (Emphasis added)

Testimony given on the witness stand does not, as a matter of law, partake of the nature of a formal judicial admission. To bind a party, the admission must be clear and unequivocal. *Weingetz v. Cheverton,* 102 Cal.App.2d 67, 226 P.2d 742 (1951); *Richey v. Pedersen,* 100 Cal.App.2d 512, 224 P.2d 100 (1950). Mangel's statements were not. They were made in the context of a third party complaint and amounted to no more than the assertion: "If I am liable, Grutzmacher is liable too." Furthermore, an admission that an error was made does not necessarily constitute an admission of negligence.

We conclude that the evidence sustains a finding that Mangels was not negligent and therefore the trial court properly denied recoupment against the judgment in favor of appellee on the note.

### THE GRUTZMACHER APPEAL

On January 14, 1970, Greater Arizona Realty, Inc., through its designated broker, Glenn Mangels, had the exclusive listing on the property known as the "Apache Junction Shopping Center", which property Mr. Hvidsten had received in the exchange. Grutzmacher had an oral listing from Hvidsten on other property in Apache Junction. On January 14, Mr. Hvidsten signed a new exclusive listing with Greater Arizona Realty, Inc. on the Apache Junction Shopping Center which contained the following language:

"As a further consideration of the exclusive, it is understood that it is to be co-brokered between (Glenn Mangels) GREATER ARIZONA REALTY, INC., and Charles C. Grutzmacher, realtor."

Mangels and Grutzmacher signed the following agreement:

"JOINT VENTURE
between
GLENN MANGELS and CHARLES C. GRUTZMACHER
on
THE APACHE JUNCTION SHOPPING CENTER
and
LAND

Glenn Mangels is to submit a list which is attached hereto and made a part hereof, of the people who are to excluded [sic] from this Joint Venture. In the event a sale is consumated to any of these people, there will be no split.

Parties agree to share expenses of any material or packaging from this date forward 50%–50%. No travel or expense of this type is to be divided, each is to pay his own.

*50–50 split on any sale or exchange from this date forward regardless when.*" [2] (Emphasis added)

In March of 1970, Grutzmacher temporarily left Arizona and went to Colorado. In May of 1970, he turned in his real estate license, did not renew it until December 21, 1970, and did not further renew it when it automatically expired on December 31, 1970 until March of 1971. In the meantime, the exclusive listing had expired. Mangels was able to interest Hvidsten in an exchange of

---

**2.** In a handwritten and signed Agreement which preceded the typed agreement this phrase read "Split 50–50 on anything else regardless of when sold or exchanged."

the Apache Junction Shopping Center. On December 3, 1970, Hvidsten and the buyers signed a written agreement for the exchange of property which was finally closed in January of 1971.

At the trial, Mangels testified as to the circumstances leading to the signing of the joint venture agreement. He had the exclusive listing on the property. It originally expired on January 1, 1970, but was extended until February 1, 1970, since Mangels was planning to present the property at an exchange seminar at which approximately 100 brokers would be present. In order to properly present the property Mangels thought it would be necessary to extend the listing past the February 1 date. He went to Hvidsten for an extension. Hvidsten asked him to consider making Grutzmacher a co-broker on any extension. This led to the agreement of January 14, 1970, and the signing of the joint venture agreement. The extended listing expired on March 1, 1970.

Grutzmacher, who had been a partner in the real estate business in Tucson with Mangels, testified that the joint venture agreement was entered into because Hvidsten was originally Mangels' client and since Hvidsten was moving to Grutzmacher's area in Phoenix, they ought to enter into an agreement that if, at any time in the future either had a listing, there should be a 50–50 split on any sale.

Mangels testified that he and Grutzmacher intended the split to apply only to those persons to whom the property was shown during the period of the exclusive listing, except for those names on the list attached to the agreement, and that the joint venture existed ". . . from this date forward" as to those persons only. Grutzmacher denied this and relied on the terms of the agreement.

Mangels claims that Grutzmacher cannot sue for his share of the commission because Grutzmacher was not licensed in Arizona on December 3, 1970, as required by A.R.S. § 32–2152, which states:

"Action by broker or salesman to collect compensation

An action for the collection of compensation earned may be maintained in the courts of the state by any broker or salesman. To commence the action the complaint shall allege that the plaintiff was a qualified licensed broker or salesman at the time the claim arose."

It is Mangels' further position that he is forbidden to pay any of the commission to Grutzmacher because such payment would violate A.R.S. § 32–2155(B):

"It is unlawful for a person, firm or corporation, whether obliger, escrow holder or otherwise, to pay or deliver to anyone compensation for performing any of the acts specified by this chapter, as a broker, who is not licensed at the time the service is rendered. . . ."

Mangels also claims that his testimony below, if believed, would of itself justify the decision of the trial court.

Grutzmacher claims the aforementioned statutes are inapplicable to the facts here and that the parol evidence rule precludes the use of Mangels' testimony to contradict or vary the terms of the joint venture agreement.

█ The parol evidence rule excludes the use of extrinsic evidence to add to, subtract from, vary or contradict the terms of a complete and *unambiguous* written contract. *Richards Development Company v. Sligh,* 89 Ariz. 100, 358 P.2d 329 (1961). Where the ambiguity is confined to a particular provision of the writing, the extrinsic evidence must be confined to such provision. *Garner v. American Home Assur. Co.,* 62 Tenn.App. 172, 460 S.W.2d 358 (1970); 32A C.J.S. Evidence § 959(1) a.

█ The parol evidence rule is a doctrine of substantive law and not merely an exclusionary rule of evidence. *Carrillo v. Taylor,* 81 Ariz. 14, 299 P.2d 188 (1956).

█ Appellee suggests that the joint venture agreement is ambiguous because it does not state the subject of the 50–50 split. The rule in Arizona is that parol evidence of the preliminary negotiations leading up to a contract may not be used to vary or contra-

dict a written instrument. *Coe v. Winchester,* 43 Ariz. 500, 33 P.2d 286 (1934). See also, Annot., 41 A.L.R.3d, p. 1384 at 1396, et seq. It is also the rule that a contract is to be read in the light of what the parties intended, as gathered from the language thereof and in view of all the circumstances. If, in so doing, the intention of the parties is clear, there is no ambiguity. *Arkansas Amusement Corporation v. Kempner,* 57 F.2d 466 (8th Cir. 1932). When the circumstances of the agreement are considered, it is clear that the 50–50 split refers to a commission, and there is no longer any ambiguity in that respect. It is also clear that the sale or exchange refers to a sale or exchange by Mangels or Grutzmacher as brokers. However, Mangels would change the provision to read as follows:

> "50–50 split on any sale or exchange from this date forward regardless when *to any persons to whom the property was shown during the period of the exclusive listing agreement dated January 14, 1970.*" (Emphasis added)

This clearly varies and adds to the contract in violation of the rule laid down in *Coe v. Winchester,* supra. We presume the trial court followed the law and did not consider Mangels' testimony which violated the parol evidence rule, but instead, based its decision on the statutes previously set forth.

Do A.R.S. §§ 32–2152 and 32–2155(B) apply here? Is Grutzmacher suing for compensation earned? The purpose of these statutes is to protect the public from unscrupulous and unqualified persons. *Bonasera v. Roffe,* 8 Ariz.App. 1, 442 P.2d 165 (1968). We believe A.R.S. § 32–2152 forbids any unlicensed person from suing to recover a broker's or salesman's commission for services performed which require a license. When the exchange agreement was entered into on December 3, 1970, Grutzmacher was not licensed. However, he is not suing for any services he performed. Mangels performed the services which required a license and he was at all times licensed. Grutzmacher was suing to enforce his rights under the joint venture agreement and A.R.S. § 32–2152 is inapplicable .

Likewise, A.R.S. § 32–2155(B) is inapplicable. It prohibits fee splitting with an unlicensed person who performs acts for which a license is required. Again, Grutzmacher is suing for his share which resulted from Mangels' performance. Grutzmacher was licensed at all times that he performed services under the agreement. The trial court erred in denying Grutzmacher relief on his counterclaim.

The judgment in favor of appellee and against appellants Berth C. Ness, Louise P. Ness, Ness Investment Company, Wild Rice Motor Company and Grafton Implement Company is affirmed. Appellee is awarded attorneys' fees on appeal pursuant to the provisions of the promissory note in the sum of $1,500. The judgment in favor of appellee and against Charles C. Grutzmacher and Desert Realty, Inc., is reversed and remanded for further proceedings consistent with this opinion.

HATHAWAY and RICHMOND, JJ., concur.