[Crim. No. 2263. Second Appellate District, Division Two.—December 9, 1932.]

THE PEOPLE, Respondent, v. GEORGE VICTOR LINDSTROM, Appellant.

Thomas W. Cochran for Appellant.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

WORKS, P. J.—Defendant was charged with the commission of crime in three counts, two of kidnaping and one of assault with a deadly weapon. He was acquitted under the latter count but was convicted under the other two. He appeals from the judgment of conviction and from an order of the trial court denying his motion for a new trial.

The sole point made by appellant is that the evidence was insufficient to support the verdict, this for the reason that he committed, under coercion, the acts upon which the kidnaping charges were based. That he so acted, he says, is shown by undisputed evidence.

"All persons are capable of committing crimes except those belonging to the following classes: . . . Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menace sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused" (Pen. Code, sec. 26). See, also, as defining the import of this language of the section, *People* v. *Saunders*, 82 Cal. App. 778 [256 Pac. 251]. In the present case the trial judge gave the jury this very proper statement of the law: "You are instructed that if you believe that the defendant in this case committed the act as charged in the information under a threat or menace sufficient to show that he had reasonable cause to and did believe that his life would be endangered if he refused to commit such act as charged, then you must acquit him."

The question whether there was a conflict in the evidence may largely be solved upon the testimony of appellant himself. He said that for some time he had known one Miller and one Criter; that on a certain morning Miller asked him over the telephone whether he could get Miller five cans of alcohol, appellant then being engaged in bootlegging, and he said he could. He then arranged over the telephone to get the product from one Joe and arranged to meet the latter in front of a certain hotel in Los Angeles at a certain time, and did meet him at 11 o'clock of the morning Miller had called. Joe then borrowed appellant's car and returned with the alcohol in about half an hour. Appellant agreed to pay one hundred dollars for the alcohol and did pay Joe fifty dollars down, leaving fifty unpaid. He later

took the product to Compton for delivery to Miller, arriving there at 4:30 or 4:45 in the afternoon, but Miller was not at home. He parked his car near Miller's house with the alcohol in it and remained about the place for some time, leaving the car twice, however, in an endeavor to find Miller in the neighborhood. After returning the second time he found the alcohol was not in the car. He then drove to Los Angeles, where he had agreed to meet Joe at 7:30 and pay him the fifty dollars yet due on the alcohol, and told Joe that he could not pay—that the alcohol, instead of being delivered to Miller, had been stolen. Joe said, "Lindstrom, what are you trying to pull on me?" Lindstrom replied, "Nothing. I had this alcohol sold, but somebody just took it away from me." Joe said, "Where did you take this stuff?" Lindstrom testified, "I told him where I took it, and he told me to get in the car and go down there and show him where I had taken it." The two then drove to Miller's house in Compton, arriving there at "10:30 or 11 o'clock" that night. Joe and Miller were introduced and Joe asked Miller if he knew anything about the alcohol. Joe then asked Lindstrom, "Where was the car sitting when you had it parked this afternoon?" Lindstrom answered, "Just across the street." Criter had been present during this conversation and the four then went over to where the car had been parked. The following questions and answers appear in the record at this point: "Q. Up to that time had you seen any gun in the possession of this man Joe? A. Yes, sir. . . . When he told me to get in the car in front of the . . . hotel. Q. Did he take his gun out of his pocket? A. No, he did not; he had it in his belt, and he said—when he told me—he says, 'I am afraid you are trying to pull something on me; be careful.' " Lindstrom testified that when the quartet arrived at the place where the car had been parked: "I tried to show them where there was some [footprints]—there is a vacant lot across the street, and it showed where there were some tracks, and I had the flashlight in the car, and I got that and was looking around trying to—well, I was trying to see how— what had happened." Joe then said, "These are not your tracks, Miller, are they?" Miller answered that they were not. "Q. Then what occurred? A. Well, [Joe] said, 'You boys get in the front seat.' He had his revolver by then

and motioned—he said, 'You boys get in the front seat.' . . .
Well, he said [to Lindstrom], 'You get in the car and
drive.'" To this Lindstrom replied nothing, nor did
either he, Miller or Criter say anything to Joe during a ride
which followed, and during which Joe occupied the back
seat. Miller and Lindstrom "tried to start up a conversa-
tion or something", apparently between themselves, when
Joe said, "You guys shut up; this is no picnic." After a
ride of some duration—whither the record does not show—
Joe said, "You boys get to hell out of this car," having a
pistol in his hand at the time, and the three complied. Lind-
strom testified that he was then in fear of his life. When
all were out of the car Joe said, "Now, where is that
alcohol?" After stating this question Lindstrom added,
"They naturally didn't know anything about it." Then
followed questions and answers, thus: "Q. Well, what did
they say? . . . A. They said they didn't know. Q. Did
he say anything to you? A. Well, not at that time, he
didn't. He shot a couple of times; tried to scare everybody,
I suppose." (It should be observed here that these shots
were discharged toward the ground, one of them striking
Miller in the foot. This was shown by other testimony.)
"Q. Well, were you scared? A. I was. Q. Did he say
anything when he shot? A. He said, 'Now, do you know
where it is at?' Right after he had shot. . . . Well, Mr.
Miller said, no, he did not know and he [Joe] told me—he
said, 'Have you got a robe in your car?' I told him, 'No.'
He said, 'Tear a couple of strips off that damned blanket
and tie those boys up.' Q. You just moved your right hand
then. What was that for? A. Well, he moved his right
hand with this revolver in it. Q. Was the revolver pointed
at you? A. Well, it was pointed at me; he motioned with
it, pointed at me just as much as—well, just like you motion
with that paper, just the same as if this was a revolver. . . .
Q. Then what did you do? A. I done that; I tore strips
off the blanket, and I tied the boys' hands with it. . . .
Q. What was Joe doing while you were tying them up?
. . . A. He was standing right there, over us, watching all
three of us." Lindstrom then testified that the night was
dark, but light enough to "see what was going on", that
there were no city lights or street lights, that the party was
not close to any houses and that "it was open country".

"Q. Now, did he go on with his shooting? A. Yes, he did. Q. Did he shoot at you? A. Well, no, he didn't exactly shoot [sic] me. . . . Q. Did you make any statement to him at all during this period? A. No. Q. Or tell him not to do anything? A. I told him that this is going pretty far, isn't it? And he said, 'Never mind.' Q. Was that before or after you tied up these boys' hands? A. It was while I was tying them up." Lindstrom further testified that they all remained at this secluded spot about forty-five minutes; that they then returned to Miller's house, all being seated in the car in the same positions they had occupied before. Appellant and Miller remained at the latter's house while Joe and Criter went to procure a physician to attend Miller's wounded foot. When Joe and Criter returned appellant drove Joe to Los Angeles, where appellant borrowed fifty dollars from a friend and paid it over to Joe, thus satisfying the account of that strenuous bill collector.

On cross-examination appellant testified that he and Joe left the hotel in Los Angeles for Compton at about 8:30, that they drove directly to Compton, without stop, a distance, so Lindstrom said, of eighteen or twenty miles. The witness gave the course over which the trip was taken. The arrival at Compton was at about 11 or 11:30. Appellant had never seen Joe before that night, and became acquainted with him only that morning by telephone call from Joe. The witness said that soon after Miller ordered the alcohol from him he received a call from Joe, who said he had heard that appellant was sometimes in need of alcohol and that he had some to sell. Appellant then arranged to meet Joe in front of the Los Angeles hotel, Joe giving a description of himself for purposes of identification at the proposed meeting place. "Q. I believe you stated that you were standing in the front of Joe when he fired the gun. Wasn't that your testimony on direct examination? A. Well, I was—there was three or four men standing there, and I would be, naturally, in front of him. . . . They were all in front of him, practically. Q. The three of you were lined up there, is that it? A. Practically so, yes."

After appellant left the stand a witness for the People testified that the distance from the hotel in Los Angeles to Compton, over the route traveled by appellant and Joe, is fourteen miles. Appellant took the stand again and,

despite his previous testimony to the effect that the ride taken by him and Joe to Compton was continuous, swore that they stopped at Huntington Park for sandwiches.

We think there was enough testimony of appellant's guilt, furnished by himself, to give rise to a conflict in the evidence. There was nothing in the conduct of Joe, as exhibited toward himself and shown without conflict, which gave appellant reasonable cause to believe that his life was in danger because of the bluster of Joe. In other words, from appellant's testimony the jury was justified in finding that Joe's belligerent attitude was adopted only in an attempt to ascertain whether Miller, and perhaps Criter, had purloined the missing alcohol. We think this remark is justified by the general trend of appellant's testimony. In particular, however, the jury must have regarded with suspicion the testimony of appellant to the effect that on the drive to Compton he and Joe stopped at Huntington Park to eat, after he had very positively stated that no stops were made on the way. He could not have failed to remember, when he first spoke on the subject, whether they had stopped or not. Also, not only does the record of appellant's testimony fail to show any spirited remonstrance directed by appellant against Joe's conduct at any time, but there was an entire absence of showing as to what occurred between the two during the excessively long time spent on the ride to Compton, whether they stopped for sandwiches or not.

Judgment and order affirmed.

Craig, J., and Thompson (Ira. F.), J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 5, 1933.

Curtis, J., and Preston, J., dissented.