[Crim. No. 3640. First Dist., Div. One. Sept. 29, 1959.]

THE PEOPLE, Respondent, v. GILBERT LLOYD OTIS, Appellant.

*Assigned by Chairman of Judicial Council.

Werner D. Meyenberg, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, Clarence A. Linn, Assistant Attorney General, and Peter T. Kennedy, Deputy Attorney General, for Respondent.

TOBRINER, J.—Appellant here cannot properly complain of the court's failure to instruct that fear of serious bodily

harm constitutes duress if neither the instruction, nor the facts of the case itself, compose a present, active and immediate peril of such harm. Nor does the fact that a witness stated that "[a]s far as I could gather" an overheard conversation referred to a particular matter necessarily render the testimony inadmissible. Finally, evidence of an attempt to escape during the period of confinement constitutes proof of consciousness of guilt and is admissible. We discuss these propositions in more detail *infra*.

Charged on November 10, 1958, with violation of section 4502 of the Penal Code, and found guilty, after trial by jury, appellant appeals from both the judgment and the denial of the motion for new trial. Section 4502 provides: "Every prisoner committed to a State prison who, while at such State prison . . . has under his custody or control any . . . dirk or dagger or sharp instrument . . . is guilty of a felony . . . ."

Previously convicted of burglary, car theft, escape, and destruction of jail, appellant entered Soledad State Prison on December 13, 1957, being placed in the "maximum wing" of the prison, known as the adjustment center, a wing completely isolated from the rest of the prison.

On the afternoon of September 6, 1958, Joe Davis, an inmate of the other part of the prison, who until that day had been confined in the adjustment center, suffered death by knifing. The prison authorities conducted an immediate search for the murder weapon. At about 11:45 p. m of that day the authorities found, in appellant's cell, three concealed knives and a file. One of the officers then exclaimed to appellant, " 'These are the type of things that killed your friend Davis.' " Appellant did not answer.

The remaining facts of the case crystallize into three incidents which project the legal issues we shall discuss. These embody the issue of duress, the issue of the admissibility of the overheard conversation under the opinion rule, and the admissibility of an escape attempt in the cutting of the bars of appellant's cell to indicate appellant's consciousness of guilt.

*The concealed knives.* Appellant's defense as to the concealed knives and file rested upon his plea of duress. He testified that in May or June, 1958, Davis threatened him with violence unless he received and secreted the knives. Appellant further testified that on the day before Davis's death

appellant told Davis he intended to dispose of the knives as soon as Davis was transferred from the adjustment center. According to appellant, Davis then obtained a knife from appellant, "stuck the point of the knife in me," saying, " 'That's only a sample of what you'll get if you don't keep them.' " Fearing reprisal if he were required to divulge this incident, appellant asserts he did not seek medical care but placed a band-aid upon the wound. Several other inmates, admitted friends of Otis and Davis, corroborated appellant's testimony that Davis threatened him.

Appellant admits that at the time of the threat the bars of the cell separated him from Davis. Questioned whether he feared for his life at that time, appellant answered, "Fear of my life at some future date, not at that particular time." Appellant's cross-examination discloses that after Davis's death he had several opportunities to contact prison guards but that he did not do so, and, indeed, when apprised by the inmates that his cell was to be searched, hid the knives in the toilet.

*The overheard conversation.* Turning to the second factual incident which prompts the legal issues, Officer Gerbrandt testified that in October, 1958, he overheard appellant talking to several other inmates. When the prosecution asked whether he was "discussing his case at that time," Gerbrandt responded, "As far as I could gather I would say yes, he was referring to this case." When appellant objected, the court said, "Sometimes a person's use of words indicates a best recollection. Just because a person says 'I think' does not necessarily mean it's a conclusion." Upon being asked what he heard, Gerbrandt responded: "I heard the word 'Davis' mentioned, so that's when I perked up my ears and I heard Otis distinctly say . . . 'Poor old Davis wouldn't mind taking the blame, because he would probably want it this way.' "

*The hacksaw blades.* The third factual situation, leading to the issue of the right of cross-examination of appellant on attempted escape, lies in testimony as to his possession of hacksaw blades. Appellant, on cross-examination, denied such possession; his counsel offered an objection on the ground of irrelevancy, which was overruled; the prosecution asked if appellant had such blades on December 9, 1958, and again appellant answered negatively. In rebuttal one of the prison officials testified that when he checked the bars in appellant's cell on December 9, 1958, one came off in his hand, and

examination of the next one revealed it had been sawed half-way through. On the opposite side of the corridor, in front of Otis's cell, next to a water pipe and a small opening, the official found four hacksaw blades.

We now consider each of these situations in their legal context.

The first query involves the instructions requested and rendered as to the duress urged as a defense for the retention and concealment of the knives. Appellant urged the following instruction: "When an act, which would otherwise be criminal is done under such threats or menaces as show that the person threatened or menaced was in danger of death *or serious bodily harm* if he had refused to do that act, or that he had reasonable cause to believe that danger of death or serious bodily harm existed, those threats and menaces serve as a valid, legal excuse for the doing of that act." (Italics added.) The contrary instruction of the court, as given, stated: "A person who committed an act or made an omission charged against him as a crime and who so conducted himself . . . to show that he had reasonable cause to and did believe that *his life would be then and there endangered* if he refused, may not be found guilty of crime because of such conduct." (Italics added.) The difference in the proposed and rendered instructions raises the questions whether (1) fear of serious bodily harm suffices as an excuse in place of fear of death; (2) whether the fear, be it of bodily harm *or* death, must be of an immediate or imminent danger.

We shall point out that while one line of cases holds fear of bodily harm sufficient to excuse the commission of the offense, another parallel line requires, for that defense, fear that the person's life would be endangered. Whatever reconciliation may be made as to this conflict, both groups of decisions require that the peril be present, active and immediate. Appellant's instruction omitted such a requirement, and the facts as portrayed by the record afforded no substantial basis for an instruction containing it.

The line of cases upon which appellant relies interpret section 1111 of the Penal Code in relation to section 26, subdivision eight. Section 1111 contains in part: "An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." Section 26, subdivision eight, excepts as persons "ca-

pable of committing crimes": "Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

In determining whether a participant is excused from violation of section 288a of the Penal Code, many cases construe the above sections to require no more than fear of serious bodily harm. Thus "A person who participates in an act in violation of said section [Pen. Code, § 288a] solely because such person has been threatened with, and is in fear of, great bodily harm is not an accomplice." (*People* v. *Peterman* (1951), 103 Cal.App.2d 322, 325 [229 P.2d 444].) In a prosecution for such an offense "one cannot voluntarily participate in the common intent and purpose with which the principal perpetrator commits a crime, if he merely consents to do so on account of physical force exercised against him, or because of threats of great bodily harm." (*People* v. *Battilana* (1942), 52 Cal.App.2d 685, 698 [126 P.2d 923].) In *People* v. *Ellis* (1955), 137 Cal.App.2d 408, 414 [290 P.2d 266], the court refers to "fear of great bodily harm" as the relevant test.

However, even in the limited area in which these cases occur, that is, the application of Penal Code, section 1111, in violations of section 288a, other decisions rely upon the test of fear of not merely bodily harm but of life itself. Thus in *People* v. *Hart* (1950), 98 Cal.App.2d 514 [220 P.2d 595], cited by appellant, testimony of the alleged accomplice that. " '. . . I was afraid to break my leg over again . . .' " convinced the court that it was not sufficient "to support a finding that M actually believed that his life was in danger." (P. 516.) And in the following cases this court in similar prosecutions found not only fear of bodily harm but fear of life: *People* v. *Bias* (1959), 170 Cal.App.2d 502, 507 [339 P.2d 204]; *People* v. *Willis* (1954), 129 Cal.App.2d 330, 334 [276 P.2d 853].

While these last two cases make no fine distinction between the two types of fear, precision in separating them has become somewhat unrealistic in the light of recent psychological research. Dean Pound has described the influence in the development of American law of the Puritan "doctrine of a 'willing covenant of conscious faith' made by the individual" (Pound, The Spirit of the Common Law [1921], p. 42), one consequence of which "was to make for the in-

dividualistic conception that all legal consequences depend upon some exertion of the will, as against the feudal conception of referring them to some relation." (P. 43.) If duress frustrated or dominated willed action it would affect and sometimes even excuse the "legal consequences." We have more recently learned that duress may factually be caused in many ways and by many techniques; for example, by the process popularly known as "brainwashing." This modern discernment of the psychological factors of duress at least throws some doubt on the extreme niceties of these legal distinctions between fear of serious bodily harm and fear of life itself.

■ We need not, however, decide the legal consequence of this dichotomy of fear. The common characteristic of all the decisions upholding the excuse lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict a phantasmagoria of future harm. Thus the court in *People* v. *Martin* (1910), 13 Cal. App. 96 [108 P. 1034], stated, "[I]t would be an anomalous condition of the law that would justify or excuse the commission of a felony against the person or property of an entirely innocent person because the person doing the deed had reason to fear, and did fear, not an imminent and immediate danger to his life, but a future and remote danger, and one that in the very nature of things could be readily averted by innocent methods." (P. 103.) Indeed, the very case relied upon by appellant (*People* v. *Sanders* (1927), 82 Cal.App. 778 [256 P. 251]) upheld the instruction: " 'The danger must not be one of future violence, but of present and immediate violence at the time of the commission of the . . . act.' " (P. 785.) To the same effect: *People* v. *Simpson* (1944), 66 Cal.App.2d 319 [152 P.2d 339]; *People* v. *Sing Chan* (1944), 64 Cal.App.2d 167, 171 [148 P.2d 81]; *People* v. *Lindstrom* (1932), 128 Cal.App. 111 [16 P.2d 1003]; Fricke, California Criminal Law (5th ed., 1954), p. 69; I Burdick, The Law of Crime (1946), § 199, p. 262.

Not only did the proposed instruction lack any reference to immediacy but the record disclosed no evidence deserving of consideration which would support this instruction. (*People* v. *Burns* (1948), 88 Cal.App.2d 867 [200 P.2d 134].) Such an instruction could not properly have applied to the facts as developed by the record. (*People* v. *Geibel* (1949), 93 Cal.App.2d 147, 178 [208 P.2d 743].) These facts dispel

the possibility of "present, imminent and impending" bodily harm in that: (1) the aggressor was not physically present to execute such a threat except upon isolated occasions, and as of the day of inspection he had been removed by death itself; (2) the aggressor, before that date, was himself incarcerated in a different cell in a maximum security wing of the prison so that the whole physical structure served both to prevent the aggressor, and protect the victim, from aggression; indeed, when Davis pricked appellant with a knife the bars of the cell separated the two men and Davis could, and did, inflict only slight injury; (4) appellant had available to him recourse to further protection by informing the prison officials of the threats; (5) the threats themselves had stretched over a period from May to September, so that to some extent they became stale and partially remote.

The proposed instruction failed to incorporate the element of immediacy of danger, which is essential whether the fear be of death or bodily injury; the record did not impose upon the court the obligation of giving such instruction on either its own initiative or upon the unexercised prerogative of appellant. Nor can we overlook the practical danger of the collection of knives in a prison cell, a danger which became real and fatal here in the death of Davis; we must find more than the fear of future harm to excuse the commission of such an offense.

Turning to the second incident, involving the overheard conversation, the conclusionary characterization by the officer did not render this testimony inadmissible. While we recognize that there are many situations in which a witness's opinion or conclusion might produce harmful misconceptions, the rule of exclusion is not of absolute application. In the dynamics of trial, the court of original investigation can best appraise the danger of a question calling for an opinion or conclusion, and the court can exclude it if necessary. Both the cases and commentators indicate that the admissibility of the testimony should be a matter of the trial court's discretion. Surely in the instant case, when the objection rested upon the ground that the witness stated that "[a]s far as . . . [he] could gather" the overheard conversation referred to the Davis matter, the court could properly exercise its discretion as to the introduction of the testimony.

As Witkin points out (California Evidence (1958), § 169, p. 190), citing *Nolan* v. *Nolan* (1909), 155 Cal. 476 [105 P. 520, 132 Am.St.Rep. 99, 17 Ann.Cas. 1056], "[t]here are in-

dications in California of support for this discretionary approach.'' ■ In the Nolan case Justice Henshaw states the ''true rule'' to be ''well established: to permit, or refuse to permit, such questions is a matter resting largely in the discretion of the trial court, which discretion will not here be reviewed unless it is made plain that the court's ruling in admitting the evidence has worked an injury.'' (Pp. 480-481.)

Favorably quoting that language, this court in *Burke* v. *City & County of San Francisco* (1952), 111 Cal.App.2d 314, 319-320 [244 P.2d 708], ruled admissible the testimony of a witness that in his ''opinion'' it would cost him a named amount to replace his wife's services in their home. Indeed, in another opinion of this court written by Justice Wood, *Weingetz* v. *Cheverton* (1951), 102 Cal.App.2d 67 [226 P.2d 742], we held that testimony of a witness prefaced by ''such expressions as he thought so, he claimed, he was not positive, or he was of the opinion'' did not render the testimony inadmissible, since ''[t]he law does not require that the result of a witness' observation be positive or absolute knowledge.'' (P. 73.) The substance of both these cases, upholding the ruling of the trial court that the testimony was properly admitted, concurs in the observation of Judge Learned Hand in *United States* v. *Cotter* (1932), 60 F.2d 689: ''No doubt . . . it is best to confine . . . [the witness] so far as possible, to the details of what he has seen and heard, though these are really as much 'conclusions' as anything else; but the degree of this should be substantially left to the judge who conducts the trial.'' (P. 694.)

The historical development of the opinion rule shows it is not immutable. Originally the rule did not exclude, but only limited, the weight of such ''opinion'' testimony. Thus, ''in early English practice opinion testimony in the form of inferences taken by a fact-knower witness was not disparaged to the extent of absolute exclusion. The disparagement went only to the lack of weight to be accorded it by the trier of fact. It is in this aspect that there developed an exclusionary principle which today is known as the 'opinion rule' . . . .'' (Tryee, *The Opinion Rule,* 10 Rutgers L. Rev. (1955-1956), 601, 602-603.)

That the more generally accepted modern version of the rule solidifies it into an absolute form has provoked adverse comment (American Law Institute, Code of Evidence, Proposed Final Draft (1942), p. 120; 7 Wigmore on Evidence, (3d ed., 1940), § 1929, p. 26; McCormick on Evidence (1954),

§ 11, p. 21; Cowen and Carter, Essays on the Law of Evidence (1956), pp. 162-172) and the demand that it be recast in a more practical as well as sensitive formula. (See Fisch, *Lay Opinions in New York,* 37 Cornell L. Q. (1951), 32, 37.)

In the instant situation we find a proper exercise of the court's discretion in admitting the testimony.

As to the final issue of the hacksaw blades, the purpose of this testimony, offered by the prosecution, must have been, of course, to establish appellant's intent to escape; it was produced as an implied admission or consciousness of guilt. Since the claimed action occurred during the period appellant awaited trial, it compares with the situation in *People* v. *Burwell* (1955), 44 Cal.2d 16 [279 P.2d 744], in which the Supreme Court upheld the admissibility of letters which "revealed plans for an escape during the trial. Such evidence is admissible to show consciousness of guilt." (P. 34.) To the same effect: *People* v. *Schafer* (1911), 161 Cal. 573, 578-579 [119 P. 920]; *People* v. *Arnold* (1926), 199 Cal. 471, 497 [250 P. 168]. This special basis for admissibility disposes of appellant's argument, buttressed by *People* v. *Albertson* (1944), 23 Cal.2d 550 [145 P.2d 7], *People* v. *McCullough* (1958), 158 Cal.App.2d 310 [322 P.2d 289], and similar cases, that in the ordinary situation proof of other crimes is not admissible.

We affirm the judgment and the denial of the motion for a new trial.

Bray, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 25, 1959.