Filed 2/26/14  P. v. Alvarez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAMIRO ALVAREZ et al.,<br><br>    Defendants and Appellants. | B245768<br><br>(Los Angeles County<br>Super. Ct. No. KA086838) |

APPEALS from judgments of the Superior Court of Los Angeles County.  Ronald S. Cohen, Judge.  Affirmed in part; reversed in part.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant Ramiro Alvarez.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant Rodney Coronel Perez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

The court sentenced Ramiro Alvarez and Rodney Perez to life without possibility of parole after a jury found them guilty of first degree murder with the special circumstances that (1) the victim was a witness to a crime and (2) the defendants were active gang members who committed the murder for the benefit of their gang. Appellants argue their convictions should be reversed based on insufficiency of the evidence and instructional errors. They also seek correction of alleged sentencing errors. We affirm the judgments except for the parole revocation fines.

## FACTS AND PROCEEDINGS BELOW

### A. The 2009 Mother's Day Murder

In 2008, Roberta Romero testified against two Azusa 13 gang members charged with murder. The two gang members were convicted and one received the death penalty. After the trial, police placed Romero and her six-year-old son in a witness protection program outside the area but Romero frequently returned to the Azusa area with her son to visit Romero's mother, Barbara Garcia, and her sister, Vanessa Medina, who lived together in West Covina.

On Mother's Day 2009, Romero and her son visited Garcia and Medina at their home. Medina was dating defendant Alvarez, an Azusa 13 gang member.

After dinner, Romero left her son asleep at Garcia's home and went to visit a friend who also lived in West Covina. Around midnight Alvarez and defendant Rodney Perez, also an Azusa 13 gang member, arrived at Garcia's house and for the next three hours Medina, Alvarez and Perez stood outside the house drinking beer.

At approximately 3:00 a.m., Perez said he needed to use the bathroom and went inside the house. He came out of the house carrying Romero's son. Medina heard Alvarez tell Perez to put the boy back inside the house and say to Perez: "You're not going to kill any kid." Perez walked to his car and told Medina to call Romero and tell her "if she wants her baby [then] she needs to go with [Perez]." Medina refused to call Romero. Perez took Medina's cell phone and texted Romero: "I need to pick you up

2

ASAP. [Your son] is sick." Perez also called Romero on the cell phone and left a similar message.

After Perez delivered his messages he, Alvarez and Medina drove to Romero's friend's house bringing the boy with them. When they arrived at the friend's house, Romero came out to the car and asked, "What's wrong with the baby?" Medina answered, "Nothing." Perez told Romero that "if she wanted the baby she needs to come with him." Romero did as she was told and Perez drove back to Garcia's house. When they arrived, Perez and Medina took the boy inside the house and put him to bed. While they were inside Medina asked Perez "What's going on?" and Perez told her he was just going to take Romero "to talk to somebody." He assured Medina "nothing's going to happen" to her or her sister. She noticed that Perez was carrying a gun.

As Medina got back into Perez's car she heard her sister tell Alvarez: "Por favor, not in the head, in the chest." The four then drove off in Perez's car. During the drive Medina heard Romero say to Perez and Alvarez that "she knew what she did; that she fucked up, but she wasn't the only one [who testified against the gang members]." Perez replied: "The homie's going [to] die for this." Alvarez commented, "We shouldn't do [this]."

After approximately 20 minutes Perez stopped in a dark field but when he saw a security guard he drove on. After another 15 or 20 minutes, Perez stopped in a residential area of Pomona. It was quiet, dark and no one was outside. Romero started to smoke a cigarette but before she finished Perez came around the car, opened Romero's door and said, "Get out of the car, bitch." Perez took her by the arm and pulled her out. Perez and Alvarez were wearing yellow plastic gloves.

Alvarez walked Romero into a cul-de-sac and a few minutes later Perez joined them. Medina saw Romero kneeling on the ground. Perez was standing at her side. Medina testified she saw a "gunshot light" and heard three shots—first one and then "two more shots at the same time." A witness who lived in the area testified she was awakened by gunfire. She heard a shot followed by two "consecutive, quick ones."

3

After hearing the shots, Medina saw Romero lying on the ground.  She ran to her sister but Perez ordered her back in the car and she obeyed.  As they drove away Alvarez apologized to Medina for killing her sister.  Perez told her "they had to do it because a homie was going to die[.]"

Later that morning Perez, Alvarez and Medina visited Alvarez's cousin Rodarte at his home in Fontana.  After they left, Rodarte contacted the police and recounted what Alvarez had told him.  Rodarte testified at trial and his recorded statement to the police was played to the jury.  According to Rodarte, Perez and Alvarez wanted him to sell their .45 and .357 caliber guns for them.  Rodarte asked the men what happened and Alvarez confessed to the murder.  Alvarez told him that he and Perez both shot Romero but that he shot her first.  "He said, you know, that he shot her two times, bam bam, then when she was on the ground he shot her again, bam. . . . Then [Perez] came with the other gun and he did her up too.  Tat tat tat."

Rodarte further testified that Alvarez and Perez were "doing lines of crystal meth" at his house.  He described the two men as "nervous" and "they seemed very like I was talking to a ghost, like they seemed real pasty."  "I knew they were up all day.  And I just know that drugs played a big role in this situation."  According to Rodarte, Romero's killing had been given the "green light . . . by someone in the Mexican Mafia[.]"

Romero's autopsy showed that she suffered gunshot wounds to her head, chest and back.  Two of the wounds were approximately one-quarter of an inch in diameter and were caused by bullets fired from a .357 caliber gun.  The third wound was slightly larger and could have been caused by a bullet from a .45 caliber or a .357 caliber gun.  A .45 caliber bullet casing was found at the scene of the murder under Romero's body.  The jury could infer from Rodarte's testimony that defendants possessed both guns immediately after the murder.  A forensic pathologist testified that any one of the wounds would have caused death within a minute or two.

4

### B.     The Defendants' Gang Involvement

The information charged the defendants with the special circumstance that they murdered Romero while they were active participants in a criminal street gang and the murder was carried out to further the activities of the gang. (Pen. Code, § 190.2, subd. (a)(22).)

Defendants did not deny that they were members of the Azusa 13 gang.

The prosecution's gang expert, an Azusa police lieutenant, testified that between 2002 and 2006 he was assigned as the department's "gang detective." Before and after that assignment he was familiar with the Azusa 13 gang because it is the only gang in Azusa. Asked to describe the gang's "primary activities," the lieutenant responded: "They range from petty . . . graffiti to theft, breaking into vehicles, assaults, simple batteries, assault with a deadly weapon . . . all the way up to homicides." He named five Azusa 13 members who had recently been convicted of murder. He further testified that "if someone from Azusa 13 were told by a higher up Azusa 13 gang member to take care of a witness, to kill a witness, and they did not do so" the person who disobeyed the order could be executed. Finally, he testified that Alvarez and Perez were Azusa 13 members and Romero's murder benefited the gang because it showed what happens to people who testify against their gang.

### C.     The Verdict and Sentencing

The jury found Perez and Alvarez guilty of first degree murder with the special circumstances that the victim was a witness to a crime, that the defendants were active participants in a criminal street gang and they carried out the murder to further the activities of their gang. The jury also found true the enhancement allegations discussed below.

The court sentenced each defendant to a term of life without possibility of parole plus a consecutive term of 25 years to life under Penal Code section 12022.53,

5

subdivision (d) [personal use of a firearm causing death or great bodily injury].[1] The court imposed and stayed the remaining firearm enhancements including the vicarious firearm enhancements that apply only to principals in the commission of certain crimes for the benefit of a gang (§ 12022.53, subds. (b), (c), (d) & (e)(1)). The court also sentenced Perez to an additional five-year term under section 667, subdivision (a)(1) for his prior conviction of a serious felony. Finally, the court imposed and stayed a $10,000 parole revocation fine as to each defendant.[2]

## DISCUSSION

### I. THE FIRST DEGREE MURDER CONVICTIONS

Defendants contend that their convictions for first degree murder should be reversed because (1) the evidence was insufficient to establish premeditation and deliberation; (2) the court should have instructed the jury to consider defendants' voluntary intoxication on the issue of specific intent to kill; and (3) the court should have instructed the jury to consider whether the defendants were under duress when they committed the murder. None of these contentions has merit.

### A. Sufficiency Of The Evidence Of Premeditation And Deliberation

First degree murder is a murder that is "willful, deliberate, and premeditated[.]" (§ 189.) A murder is premeditated when it is "considered beforehand;" it is deliberate when it is formed or determined after "careful thought and weighing of considerations for and against the proposed course of action." (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.) Put another way, a murder is premeditated and deliberate "if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

---

[1]     All statutory references are to the Penal Code.

[2]     The Attorney General concedes and we agree that this fine must be reversed in light of defendants' sentences of life without parole. (*People v. Carr* (2010) 190 Cal.App.4th 475, 482, fn. 6.) We will order the court to strike that fine.

6

The evidence was sufficient to establish that Alvarez and Perez premeditated and deliberated Romero's murder. Romero was killed in revenge for her testimony against two members of the Azusa 13 gang who were convicted of murder, one of whom received the death penalty. The jury could reasonably infer that Alvarez and Perez, members of Azusa 13, decided to kill Romero in retaliation for her testimony and as a warning to others who might consider testifying against members of the gang. Alvarez and Perez brought guns and plastic gloves with them on their visit to Romero's mother's house. When they learned that Romero was not there, they devised a plan to lure her into Perez's car by using her young son as bait. When Alvarez saw Perez with the boy he admonished Perez: "You're not going to kill any kid;" indicating a plan existed to kill Romero but not her son. Shortly after arriving at a secluded residential area, they put on their gloves, took Romero out of the car and walked her to a cul-de-sac where they forced her to kneel on the ground and shot her execution style—at close range in the head, heart and back.

### B.    Request For Instruction On Voluntary Intoxication

Defendant's contend the court erred in denying Alvarez's request that the jury be instructed that defendants' voluntary intoxication may be considered in determining their intent to kill and their premeditation and deliberation. (CALCRIM No. 3426.) The court ruled correctly because no evidence supported defendants' claim of alcohol and methamphetamine intoxication. (*People v. Burney* (2009) 47 Cal.4th 203, 246.)

Medina testified that Alvarez and Perez arrived at her home around 12:30 a.m. and brought an 18- or 24-pack of beer. She testified that she drank beer with the defendants but she did not testify how much beer defendants drank. (Contrary to Alvarez's contention on appeal, Garcia did not testify that she saw the defendants and Medina drinking beer in her front yard at approximately 3:17 a.m.) Merely showing that the defendants drank alcohol before committing the murder is not sufficient to warrant an instruction on voluntary intoxication. (*People v. Roldan* (2005) 35 Cal.4th 646, 716.)

7

There was no evidence that Alvarez or Perez used methamphetamine prior to the murder. Alvarez misinterprets the record in claiming that Medina testified that she and the defendants used methamphetamine while drinking beer before the murder. No such testimony is found in the record. Furthermore, contrary to Alvarez's contention, Rodarte did not testify that Alvarez "appeared to be on meth when he arrived at his house." Although Rodarte testified "I knew they were on drugs," the court sustained the prosecution's objection to that testimony and neither defendant challenges that ruling on appeal. This leaves Rodarte's speculation that "drugs played a big role in this situation." Although this speculative lay opinion came in without objection, it is not sufficient to support an instruction on voluntary intoxication.

### C.     Request For Duress Instruction

Duress is not a defense to murder (*People v. Maury* (2003) 30 Cal.4th 342, 421) but it may negate premeditation and thus lead a jury to convict the defendant of second degree  rather than first degree murder.  (*People v. Anderson* (2002) 28 Cal.4th 767, 784.) An instruction on duress requires evidence that the defendant acted under the threat of immediate death or great bodily harm.  (*People v. Heath* (1989) 207 Cal.App.3d 892, 900 [threat of death]; *People v. Otis* (1959) 174 Cal.App.2d 119, 124 [threat of great bodily harm].)  A fear of future harm will not suffice.  (*People v. Petznick* (2003) 114 Cal.App.4th 663, 676.)

Here, the court properly denied the defendants' request for a duress instruction because there was no evidence that either of them was acting under the threat of immediate death or great bodily harm when they murdered Romero.  Defendants point to the testimony of the gang expert that a gang member who refuses to carry out an order to kill someone could be killed himself.  There was no proof, however, that anyone ordered Alvarez or Perez to kill Romero.  Alvarez's cousin, Rodarte, testified that Romero's murder had been given the "green light . . . by somebody in the Mexican Mafia" but evidence that someone in the Mexican Mafia approved of killing Romero is not evidence that someone gave Alvarez or Perez the task of carrying it out.  In any case, there is no

evidence that either Alvarez or Perez was in any immediate danger if they failed to kill Romero.  (Cf. *People v. Bacigalupo* (1991) 1 Cal.4th 103, 125 [defendant's claim that the "Columbian Mafia" threatened to kill him and his family if he did not kill two others did not warrant a duress instruction because there was no "substantial evidence of immediacy of the threatened harm"].)

## II.    THE GANG-RELATED SENTENCES

The jury found that (1) the defendants murdered Romero while they were active participants in a "criminal street gang;" (2) they committed the murder "for the purpose of furthering the activities of the gang" and "at the direction of, or in association with" the gang; (3) the defendants carried out the murder by "personally and intentionally discharg[ing] a firearm . . . within the meaning of Penal Code Section 12022.53(d); and (4) in the commission of the murder "a principal personally and intentionally discharged a firearm . . . within the meaning of Penal Code Section 12022.53(d) and (e)(1)." Based on these findings, the court sentenced each defendant to a term of life without possibility of parole and a consecutive term of 25 years to life under section 12022.53, subdivision (d).  The court imposed and stayed sentences under section 12022.53, subdivisions (d) & (e)(1)(A).  The court also imposed and stayed 10-year sentence enhancements under section 186.22, subdivision (b)(1)(C), although the information charged, and the jury found true, enhancements under section 186.22, subdivision (b)(4), not (b)(1).

Defendants argue that these enhancements should be stricken because (1) there was insufficient evidence that Azusa 13 was a "criminal street gang"; (2) the term "active participation" in a gang is unconstitutionally vague; (3) the vicarious firearm enhancements that apply only to a principal in the commission of certain crimes for the benefit of a gang (e.g., § 12022.53, subds. (d) & (e)(1)) deny those defendants due process and equal protection of the law; (4) the 10-year gang enhancement under section 186.22, subdivision (b)(1), which the court imposed, does not apply to a defendant sentenced to a life term, including life without possibility of parole.

9

## A.     Evidence That Azusa 13 Is A Criminal Street Gang

Section 186.22, subdivision (f) defines a "criminal street gang" as an "ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its *primary activities* the commission of one or more of the criminal acts" enumerated in subdivision (e) of the statute.  (Emphasis added.)  Defendants contend the evidence was insufficient to support the "primary activities" element of the criminal street gang test. We review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports that finding.  (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 610.)

The "primary activities" test is satisfied by a showing that the gang "consistently and repeatedly" committed one or more of the crimes listed in section 186.22, subdivision (e), including murder (subd. (e)(3)).  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)  The expert on the Azusa 13 gang, testified that the gang had only "10 to 15 actual active gang members in the community that are committing gang-related crime[.]"  He further testified that one of the gang's primary activities was murder and that from approximately 2004 to 2009 five members of the gang had been convicted of that crime.  Evidence that five members of a 10 to 15 member gang committed five murders over a five-year period is sufficient to show that murder is one of the "primary activities" of the gang.

Defendants argue that the gang expert's testimony was deficient because it contained no specifics as to the circumstances of these crimes, or where, when, or how the expert obtained the information.  (See *In re Alexander L.*, *supra,* 149 Cal.App.4th at p. 614.)  Such details are not necessary to establish the "primary activities" element and *In re Alexander* did not so hold.  In any case, the record contains ample evidence of the expert's personal knowledge concerning the Azusa 13 gang and the murders the gang members committed.

10

### B. "Active Participation" In A Criminal Street Gang

The street gang special circumstance also requires the defendant's "active participation" in a gang at the time of the murder. (§ 190.2, subd. (a)(22).) Alvarez and Perez contend the term "active participation" is unconstitutionally vague. Our Supreme Court disagrees. (*People v. Castenada* (2000) 23 Cal.4th 743, 751-752.) We are bound by its decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### C. Vicarious Gun Enhancements In A Gang Case

Ordinarily sentence enhancements for firearm discharge apply only to a defendant who personally discharges the weapon. (§ 12022.53, subd. (d).) As to certain crimes however, including murder, subdivisions (d) and (e)(1) of section 12022.53, read together, permit a defendant to be sentenced to a term of 25 years-to-life if the crime was committed for the benefit of a criminal street gang and a *principal* in the crime personally and intentionally discharged a firearm and proximately caused death or great bodily injury.[3] Thus in gang cases the sentence enhancement applies to aiders and abettors as well as to those who actually fire the weapon. Defendants do not dispute this interpretation. Rather, they contend that singling out aiders and abettors for increased punishment only in gang cases violates the guarantees of equal protection and due process of law.

We do not reach this issue because, as we discuss in Part III below, there was substantial evidence that both Alvarez and Perez personally and intentionally shot

---

[3] Subdivisions (d) and (e)(1) of section 12022.53 state: "(d) Notwithstanding any other provision of law, any person who, in the commission of a [specified] felony . . . personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life. [¶] (e)(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

Romero. Thus, aider and abettor liability was not a factor in their sentencing under section 12022.53.

### D. The Gang Enhancement Under Section 186.22, Subdivision (b)

Defendants maintain that the court erred in imposing the 10-year gang enhancement under section 186.22, subdivision (b)(1) because this enhancement does not apply when the defendant is sentenced to life in prison. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.) Furthermore they claim the court erred in imposing a sentence under subdivision (b)(1) when the information charged, and the jury found, an enhancement under subdivision (b)(4). As we explain more fully below, the sentence was correct. The factual findings required under subdivision (b)(1) and subdivision (b)(4) are the same. Based on those findings the court properly sentenced defendants under subdivision (b)(1), not (b)(4). As we further explain, the *Lopez* decision is inapplicable here because Lopez's life sentence carried the possibility of parole, thus subdivision (b)(5) trumped subdivision (b)(1). The defendants in this case received a sentence of life without possibility of parole, making subdivision (b)(1) the applicable enhancement provision.

#### 1. Statutory background

Section 186.22, subdivision (b)(1) imposes a sentence enhancement on a defendant who commits a felony for the benefit of a criminal street gang. The term of the enhancement depends on the nature of the felony. The subdivision states: "*Except as provided in paragraphs (4) and (5)*, any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: . . . (C) If the felony is a violent felony [including murder] the person shall be punished by an additional term of 10 years." (Emphasis added.)

12

Paragraphs (4) and (5) provide exceptions to the sentence enhancement under paragraph (1). Paragraph (4) provides that the 10-year enhancement under paragraph (1) does not apply if the felony is a home invasion robbery, carjacking, shooting at an inhabited or occupied building, aircraft or vehicle, a drive-by shooting, extortion or threatening a victim or a witness to a crime. Instead, the defendant shall be sentenced to an indeterminate term of life in prison with a minimum term set according to the nature of the crime. Paragraph (5) provides that if paragraph (4) is not applicable and the felony is punishable by life imprisonment, the defendant shall not be paroled for a minimum of 15 years.

### 2. The jury's factual findings support an enhancement under section 186.22, subdivision (b)(1)

As we noted above, the court sentenced the defendants under section 186.22, subdivision (b)(1) instead of subdivision (b)(4) as alleged in the information and found true by the jury. This discrepancy did not prejudice the defendants, however, because both subdivisions (b)(1) and (b)(4) require the same finding: the defendant committed the crime "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." The sentence to be imposed based on that factual finding is a question of law for the court.

### 3. The court properly imposed the sentence enhancement under section 186.22, subdivision (b)(1).

Section 186.22, subdivision (b)(1) unambiguously requires the court to impose sentence under its provisions "[e]xcept as provided in paragraphs (4) and (5)." (Emphasis added.) The exceptions in paragraphs (4) and (5) do not apply to this case in which the defendants were convicted of first degree murder and sentenced to life without possibility of parole. Paragraph (4) of subdivision (b) applies to home invasion robbery, carjacking, shooting at an inhabited or occupied building, aircraft or vehicle, drive-by shootings, extortion and threatening a crime victim or witness. It does not apply to murder. Paragraph (5) states that if paragraph (4) is not applicable and the felony is punishable by

13

life imprisonment the defendant shall not be paroled for a minimum of 15 years. The court in *Lopez* noted that paragraph (5) has always been "understood to apply to *all* lifers, *except* those sentenced to life without possibility of parole." (*People v. Lopez, supra,* 34 Cal.4th at p. 1010; first italics in original, second italics added.) This makes sense because paragraph (5) presupposes parole eligibility. The legislature surely did not intend the court to set a minimum time for parole eligibility for someone who is ineligible for parole.

### III.   EVIDENCE THAT EACH DEFENDANT PERSONALLY AND INTENTIONALLY DISCHARGED A FIREARM

The jury found that each defendant personally and intentionally discharged a firearm causing Romero's death. Based on those findings the court sentenced each defendant to an additional and consecutive term of 25 years to life under section 12022.53, subdivision (d). Substantial evidence supports the jury's finding.[4]

Medina testified that she heard one shot, a pause, "then the other two at the same time." A witness who lived in the area testified that she heard a gun shot followed by two "consecutive, quick ones." Rodarte told police that Alvarez reported: "They [meaning Alvarez and Perez] fucking shot her[. H]e said they shot her three times." The testimony of these three witnesses, the crime scene evidence and the forensic evidence are consistent with the conclusion that Romero suffered three bullet wounds from two different caliber guns. The jury could reasonably conclude from this evidence that one of the defendants shot Romero once and the other defendant shot her twice.

Perez argues that the evidence would also support a finding that Alvarez inflicted all three fatal wounds. He points to Rodarte's trial testimony that Alvarez told him "that he shot her two times, bam bam, then when she was on the ground he shot her again, bam. . . . Then [Perez] came with the other gun and he did her up too. Tat tat tat."

---

[4]      For this reason we need not decide whether the evidence would support a finding that one of the defendants proximately caused Romero's death even if he did not inflict one of the fatal wounds. (See *People v. Bland* (2002) 28 Cal.4th 313, 335; CALCRIM No. 3149.)

Assuming Rodarte's trial testimony would have supported a finding that only Alvarez shot Romero it is not our role to substitute our judgment for the jury's. (*People v. Guzman* (1996) 45 Cal.App.4th 1023, 1027.) Where, as here, substantial evidence supports the jury's verdict it does not matter that substantial evidence might have supported a different verdict.

## DISPOSITION

We reverse the orders imposing parole revocation fines and instruct the court to forward an amended abstract of judgment to the California Department of Corrections and Rehabilitation showing the change in sentencing. In all other respects the judgments are affirmed.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, Acting P. J.

We concur:


CHANEY, J.


JOHNSON, J.